UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

CIVIL DIVISION

CASE NUMBER



99-1271-Cv-J-20A

STANLEY STIRZAKER and NORMA
STIRZAKER,

     Plaintiffs,

vs.

KURT A. SIMPSON and KURT A.
SIMPSON, P.A.,

     Defendants.

_____/

## VERIFIED COMPLAINT FOR EQUITABLE RELIEF AND DAMAGES

The plaintiffs, Stanley Stirzaker and Norma Stirzaker, by and through their undersigned counsel, sue the defendants, Kurt A. Simpson and Kurt A. Simpson, P.A., and allege as follows:

### JURISDICTION AND VENUE

1.  This action is of a civil nature involving, exclusive of interest, costs, and attorney's fees, a sum in excess of seventy-five thousand dollars ($75,000).

2.  Stanley Stirzaker was at all times material hereto a citizen of the United Kingdom.

3.  Norma Stirzaker was at all times material hereto a citizen of the United Kingdom.[1]

---

[1]    Stanley Stirzaker and Norma Stirzaker are hereafter
(continued...)

4.   Kurt A. Simpson was at all times material hereto domiciled and a resident of Jacksonville Beach, Florida.

5.   Kurt A. Simpson was at all times material hereto an employee of Kurt A. Simpson, P.A.

6.   Kurt A. Simpson, P.A. was at all times material hereto a Florida professional association, organized and existing under the laws of the State of Florida, and doing business in Jacksonville Beach, Florida.[2]

7.   Every issue of fact and law is wholly between citizens of the state of Florida and citizens or subjects of a foreign state.

8.   This Court therefore has jurisdiction under 28 U.S.C. § 1332, due to the diversity of citizenship of the parties.

9.   All defendants reside in this judicial district.

10.  Venue is thus properly laid in this Court pursuant to 28 U.S.C. § 1391.

## INTRODUCTION

This is a case about legal malpractice of the very worst kind perpetrated upon two foreign retirees. When Simpson undertook to represent Plaintiffs, he represented that he possessed the requisite degree of learning, skill and ability necessary for the undertaking, and that he would exercise reasonable care and

─────────────

(...continued)
referred to as "Plaintiffs". Stanley Stirzaker is referred to as Mr. Stirzaker; Norma Stirzaker is referred to as Mrs. Stirzaker.

[2]   Kurt A. Simpson and Kurt A. Simpson, P.A. shall hereafter be collectively be referred to as "Simpson".

diligence in the handling of their representation. However, Simpson fell far below exercising that degree of care, skill and diligence which is commonly possessed and exercised by practicing attorneys in his jurisdiction. Simpson's failures encompassed both commissions and omissions in his duty to Plaintiffs, by his grossly negligent representation and by his failure to follow Plaintiffs' express instructions. Moreover, when he finally recognized how far he had fallen below the applicable standard, Simpson, together with his attorney in the state court malpractice action, engaged in a systematic cover up of his malpractice, which included intrinsic and extrinsic fraud, and even the destruction of evidence. What follows is extensive and detailed, but Plaintiffs believe it is necessary in order to inform the Court of the bases for this Rule 60(b) action. Plaintiffs respectfully and sincerely request the Court's patience and indulgence in reviewing the more than five hundred allegations which appear below, together with the supporting documentation therefor, documentation which is indexed for the convenience of the Court and the parties.

### ALLEGATIONS COMMON TO ALL COUNTS

11. Plaintiffs first met Simpson on August 14, 1991.[3]

---

[3] This allegation, and those which follow, is supported by Plaintiffs' verifications to this Complaint; *see also* Simpson's answer brief to the Fifth District Court of Appeal at page 6, paragraph 1, a copy of which is attached hereto and incorporated herein as exhibit 1. Plaintiffs refer frequently to Simpson's answer brief, since that brief affirmatively states that all facts contained therein are uncontroverted in the court record.

12.   In his June 7, 1994 testimony to the Florida Bar Grievance Committee, Simpson claimed he first met Plaintiffs on March 12, 1992;[4] however, he later admitted the first meeting was indeed August 14, 1991.[5]

13.   Plaintiffs were introduced to Simpson by a mutual friend, Philip Ossi.[6]

14.   Ossi told Plaintiffs that Simpson was the best immigration lawyer in the area.

15.   Ossi also told Plaintiffs that Simpson had assisted Ossi's extended family with their United States immigration issues.[7]

16.   Plaintiffs consulted Simpson about the feasibility of permanent retirement in the United States.[8]

17.   Specifically, Plaintiffs consulted Simpson about

---

[4]   *See* transcript of Simpson's June 7, 1994 testimony to The Florida Bar Grievance Committee at page 10, lines 10-14, a copy of which is attached hereto and incorporated herein as exhibit 2.

[5]   *See* exhibit 1.

[6]   *See* exhibit 2 at page 10, lines 10-14; May 12, 1993 letter from Simpson to the Florida Bar, a copy of which is attached hereto and incorporated herein as exhibit 3.

[7]   *See* Simpson's May 15, 1996 deposition at pages 9, 10, and 17, a copy of which is attached hereto and incorporated herein as exhibit 4.

[8]   *See* exhibit 1 at page 6, paragraph 1; exhibit 2 at page 10, lines 10-14; exhibit 3.

permanent immigration status in the United States.[9]

18.   Simpson told Plaintiffs that permanent immigration status in the United States is automatic for United Kingdom citizens.

19.   Simpson guaranteed Plaintiffs that he would obtain permanent immigration status in the United States for them by no later than the end of 1992.[10]

20.   Simpson advised Plaintiffs that, to obtain permanent immigration status, required only, in addition to completed immigration applications forms (hereafter the "INS Forms"): (1) birth and marriage certificates; (2) documentation of academic and professional qualifications and experience; and, (3) documentation of financial independence.[11]

21.   Thereafter, the immigration process was automatic, but could take up to a year.[12]

22.   Based upon being advised by Simpson that they could obtain permanent immigration status, Plaintiffs also consulted

---

[9]   *See* exhibit 1 at page 6, paragraph 1; exhibit 2 at page 10, lines 10-14; exhibit 3.

[10]   *See* May 27 letter from Mr. Stirzaker to Simpson, a copy of which is attached hereto and incorporated herein as exhibit 5; August 1992 letter from Norma Stirzaker to Simpson, a copy of which is attached hereto and incorporated herein as exhibit 6.

[11]   *See* April 14 letter from George Porteous, Esq. to Simpson, a copy of which is attached hereto and incorporated herein as exhibit 7.

[12]   *See* exhibit 4 at page 40, line 16 through page 43, line 10.

Simpson about purchasing a home in the area.[13]

23.    Plaintiffs knew that Simpson had recently represented two of Ossi's adult children in real estate purchases.

24.    Plaintiffs told Simpson that any house purchase was expressly contingent on the following non-negotiable conditions (hereafter the "Contingencies"): (1) permanent immigration status; and (2) sale of their United Kingdom home; and (3) satisfactory results of a detailed home survey/inspection (hereafter the "Inspection") of any to-be-purchased property.[14]

25.    Simpson thus knew that any real property purchase was dependent on the Contingencies.[15]

26.    Simpson asked whether Plaintiffs had considered the area where they wished to live.

27.    Plaintiffs replied that they wished to live in Sawgrass Country Club, Ponte Vedra Beach.[16]

28.    Simpson concluded the meeting by advising Plaintiffs that they should return to him when they had sold their United Kingdom home, to obtain their automatic permanent immigration status.

29.    Simpson failed to advise Plaintiffs that his areas of

---

[13]    *See* exhibit 1 at page 6, paragraph 1.

[14]    *See* exhibit 2 at page 10, lines 14-19 and page 14, lines 16-18; exhibit 3; exhibit 4 at page 68, lines 4-20.

[15]    *See* exhibit 2 at pages 10 and 14; exhibit 3.

[16]    *See* exhibit 2 at page 10, lines 14-19.

- 6 -

practice encompassed general office and trial practice.[17]

30.   Simpson failed to advise Plaintiffs that his areas of practice did not include real estate law.[18]

31.   Simpson failed to advise Plaintiffs that his areas of practice did not include immigration law.[19]

32.   Based on Simpson's foregoing representations, Plaintiffs retained Simpson to represent them in their immigration and real estate purchase legal matters.[20]

33.   Following their consultation with Simpson, Plaintiffs met one Frankie Parks, a rental property manager.

34.   Ms. Parks advised that properties in Lake Kathryn, a neighborhood of Sawgrass Country Club, came on the market only rarely.

35.   Ms. Parks told Plaintiffs that one of the Lake Kathryn properties, 9008 Portsmouth Court (hereafter "9008"), had just come on the market.

36.   Ms. Parks told Plaintiffs she would take them to see 9008.

37.   Plaintiffs went to see 9008, and decided they would like

_____

[17]   *See* exhibit 2 at page 4, lines 20-21; exhibit 4 at page 8, lines 3-6.

[18]   *See* exhibit 2 at page 13, line 3; exhibit 4 at page 8, lines 9-14.

[19]   *See* exhibit 4 at page 8, lines 3-8 and line 24 through Page 9, line 1.

[20]   *See* exhibit 1 at page 6.

to purchase it.

38.   Ms. Parks advised Plaintiffs to retain Stockton Land Corporation (hereafter "Stockton") to research this and other properties for them.

39.   To that end, Plaintiffs hired Stockton, and specifically, Pat Augspurger; Plaintiffs then returned to the United Kingdom on August 30, 1991.[21]

40.   Thereafter, Augspurger mailed property flyers to Plaintiffs.

41.   Following their return to the United Kingdom, Plaintiffs put their United Kingdom home on the market.

42.   Plaintiffs received a great deal of interest in their United Kingdom home; however, they were not prepared to sell their United Kingdom home until they had obtained permanent immigration status.

43.   In January 8, 1992, Plaintiffs contacted the Forsters, the owners of 9008, in their residence in Ohio (9008 being a vacation home).[22]

44.   Plaintiffs told the Forsters they wanted to buy 9008, once the Contingencies had been satisfied.

---

[21]   *See* Plaintiffs' plane tickets and Plaintiffs' passports, copies of which are attached hereto and incorporated herein as composite exhibit 8.

[22]   *See* Plaintiffs' United Kingdom telephone records, copies of which are attached hereto and incorporated herein as composite exhibit 9.

45. Based on the foregoing, Plaintiffs asked the Forsters if they would take 9008 off the market.

46. Plaintiffs told the Forsters they would sign a contract and pay a deposit, premised upon the Contingencies.

47. The Forsters said they did not want to be committed to an open-ended contract.

48. However, the Forsters promised Plaintiffs a right of first refusal.

49. In January 1992, Augspurger mailed Plaintiffs a contract on 9008 (hereafter the "9008 Contract").[23]

50. The 9008 Contract contained an inspection rider which gave Plaintiffs the right to have an Inspection of 9008 as they had insisted to Simpson they required.[24]

51. The 9008 Contract did not include the Contingencies; however, the 9008 Contract included a section where Augspurger had indicated Plaintiffs could insert the Contingencies.[25]

52. Nonetheless, Plaintiffs did not sign the 9008 Contract, because Simpson had told Plaintiffs they had to do everything through him.

53. In February, 1992, Plaintiffs booked a flight to Florida,

---

[23] *See* 9008 contract, a copy of which is attached hereto and incorporated herein as exhibit 10.

[24] *See* exhibit 10.

[25] *See* exhibit 10.

- 9 -

which they could not obtain until March 1992.[26]

54.  Plaintiffs returned to Florida on March 8, 1992 for a stay of approximately two weeks.[27]

55.  Plaintiffs came to Florida to consult with Simpson, specifically, Plaintiffs came to do whatever was necessary to obtain permanent immigration status, expecting to receive applicable documentation during that stay.[28]

56.  To that end, Plaintiffs brought with them: (1) their birth and marriage certificates; (2) their academic and professional qualifications and experience; and, (3) documentation of their financial independence.

57.  Assuming completion and receipt of permanent immigration status, Plaintiffs also came to conclude the purchase of 9008.

58.  On March 12, 1992, Plaintiffs met with Simpson for approximately one hour to discuss Plaintiffs' permanent immigration status and their property plans in the United Kingdom and the United States.[29]

59.  This was the first time Plaintiffs had had any contact

---

[26]    *See* exhibit 8.

[27]    *See* exhibit 1 at page 6, paragraph 3 through page 7, paragraph 1 and exhibit 8.

[28]    *See* exhibit 6.

[29]    *See* exhibit 1 at page 7, paragraph 2; exhibit 2 at page 10, lines 10-19; Simpson's billing records, copies of which are attached hereto and incorporated herein as composite exhibit 11.

with Simpson since August 1991.[30]

60.  Plaintiffs advised Simpson of 9008 and of their retention of Stockton.[31]

61.  Simpson told Plaintiffs this was all good, and confirmed that the purchase of real property, whether 9008 or another, would expedite the immigration process.

62.  Simpson told Plaintiffs to ensure everyone, including Stockton, knew that he, Simpson, was handling Plaintiffs' immigration and real estate matters.

63.  Simpson repeated his guarantee to Plaintiffs that he would obtain permanent immigration status in the United States for them by the end of 1992 at the latest.

64.  Simpson also advised Plaintiffs that ownership of Florida residential real property guarantees permanent immigration status and expedites the permanent immigration status process.

65.  Simpson told Plaintiffs he would obtain their INS Forms and asked them to return to his office on March 20, 1992.[32]

66.  On March 13, 1992, Simpson first wrote to the United States Immigration and Naturalization service requesting INS Forms for Plaintiffs.[33]

---

[30]     *See* exhibit 9.

[31]     *See* exhibit 1 at page 6, paragraph 3.

[32]     *See* exhibit 3.

[33]     *See* Simpson's March 13 letter, a copy of which is
(continued...)

67. In the meantime, Plaintiffs were looking at other properties for sale, with 9008 as a "benchmark".[34]

68. On or about March 13, 1992, Plaintiffs were viewing approximately eight houses per day.

69. At that time, Plaintiffs first viewed 9486 Preston Trail West (hereafter "PTW").

70. Plaintiffs spent only approximately ten minutes walking through PTW with Augspurger.

71. Neither Plaintiffs nor Augspurger inspected PTW, either in a detailed or a cursory manner.

72. On March 18, 1992, Augspurger advised Plaintiffs that there was another buyer interested in 9008, and asked if Plaintiffs were prepared to proceed, including with a mortgage application.

73. Plaintiffs responded that they would not proceed with any real estate purchase until they had obtained their permanent immigration status by and through Simpson.

74. However, only because Simpson had guaranteed Plaintiffs' permanent immigration status, Plaintiffs agreed to meet with a mortgage broker.

75. On March 19, 1992, Augspurger took Plaintiffs to view again the properties they had previously viewed, including PTW,

_____

(...continued)
attached hereto and incorporated herein as exhibit 12.

[34]   *See* exhibit 1 at page 6, paragraph 4 through page 7, paragraph 1.

since Plaintiffs could not recall all the properties they had seen on March 13, except for their first choice, 9008.

76.  Again, neither Plaintiffs nor Augspurger inspected PTW, either in a detailed or a cursory manner.

77.  Later on March 19, 1992, Augspurger took Plaintiffs to meet with Robert Castro, a mortgage broker, at Castro Mortgage Associates, Inc. of Jacksonville.

78.  Plaintiffs met with Castro, and advised him about the Contingencies.

79.  Plaintiffs showed Castro: (1) their birth and marriage certificates; (2) their academic and professional qualifications and experience; and, (3) documentation of their financial independence they had brought to provide to Simpson in support of their permanent immigration status.

80.  Castro reviewed the documents, and particularly the documentation evidencing Plaintiffs' financial independence.

81.  Based on his review of the documentation evidencing Plaintiffs' financial independence, Castro told Plaintiffs that they qualified for a one hundred percent (100%) mortgage on 9008.

82.  Castro also told Plaintiffs that, upon the sale of their United Kingdom home, they could either pay off the 9008 mortgage or invest the proceeds of the sale of their United Kingdom home.

83.  On March 20, 1992, Plaintiffs returned to Simpson's

office for the INS Forms.[35]

84.   Simpson told Plaintiffs he had not yet received the INS Forms and that he would forward the INS Forms to Plaintiffs when he had received them.

85.   Plaintiffs told Simpson they had decided to purchase 9008.

86.   Plaintiffs also told Simpson they had been to a mortgage broker about a mortgage on 9008.

87.   Simpson told Plaintiffs this was all good, and confirmed that the purchase of property, whether 9008 or another, would expedite the immigration process.

88.   Simpson repeated that, if and when the purchase of 9008 was concluded, Plaintiffs' permanent immigration status was automatic.

89.   Simpson advised Plaintiffs to sign the 9008 contract, in order to guarantee immediate permanent immigration status.

90.   Simpson asked whether Plaintiffs had viewed any other properties, for comparison purposes.

91.   Plaintiffs said they had done so, and showed Simpson the flyers of five properties.[36]

92.   One of the five properties was PTW.[37]

_____

[35]   *See* composite exhibit 11.

[36]   *See* exhibit 1 at page 7, paragraph 3.

[37]   *See* exhibit 1 at page 7, paragraph 3.

93.   Simpson reviewed the flyers, and told Plaintiffs that, while 9008 was fine, they should choose PTW, because that was the "steal" of the group.

94.   This was the first time Plaintiffs and Simpson spoke about, discussed, or in any way referenced, PTW.

95.   On March 22, 1992, Plaintiffs went to Augspurger's office.

96.   Augspurger advised Plaintiffs that 9008, their first choice of home, had been sold.

97.   Augspurger told Plaintiffs that, of the other four properties, one had been sold and two would not entertain the Contingencies.

98.   Augspurger told Plaintiffs that PTW, the fifth property, the only remaining one of the five properties, was still for sale, and the owners would agree to the Contingencies.

99.   Augspurger asked if Plaintiffs wanted her to prepare a contract on PTW.

100.   Disappointed in losing 9008 and since PTW was the last of their choices, Plaintiffs decided to reconsider their options after their return to the United Kingdom.

101.   On March 22, 1992, after Plaintiffs left Augspurger's office, Augspurger prepared a contract on PTW (hereafter the "Stockton PTW Contract") to be provided to Simpson.[38]

---

[38]   *See* Stockton PTW Contract, a copy of which is attached
(continued...)

102.     The Stockton PTW Contract included Simpson as attorney for Plaintiffs.[39]

103.     The Stockton PTW Contract contained: (1) an offer of $275,000; (2) a $25,000 refundable deposit; (3) an inspection rider; (4) a right to inspect; and, (5) space for addenda where Simpson was to insert the Contingencies.[40]

104.     On March 23, 1992, Augspurger delivered the Stockton PTW Contract to Simpson.[41]

105.     Simpson failed to present the Stockton PTW Contract to the PTW owners on Plaintiffs' behalf.[42]

106.     On March 23, 1992, Plaintiffs telephoned Simpson from the United Kingdom,[43] and discussed the purchase of PTW with Simpson for the first time.[44]

107.     On March 24, 1992, Plaintiffs retained United Kingdom attorney, George Porteous, to handle the sale of their

_____

(...continued)
hereto and incorporated herein as exhibit 13.

[39]     *See* exhibit 13.

[40]     *See* exhibit 13.

[41]     *See* exhibit 13.

[42]     *See* transcript of June 7, 1994 grievance hearing testimony of Fred L. Ahern, Jr. (hereafter "Ahern") to the Florida Bar at page 5, lines 20-21, a copy of which is attached hereto and incorporated herein as exhibit 14.

[43]     There is a five or six hour time difference between the United Kingdom and Florida, depending on the time of year.

[44]     *See* exhibit 1 at page 8, paragraph 1; exhibit 9.

- 16 -

United Kingdom home.

108.    Porteous had represented Plaintiffs in prior United Kingdom property sales and purchases.

109.    Neither Porteous nor any member of his firm at any time represented Plaintiffs in any legal matter outside of England and Wales.[45]

110.    Neither Porteous nor any member of his firm at any time represented any client in any legal matter outside of England and Wales.[46]

111.    Plaintiffs also asked Porteous if they could use his facsimile machine as a post box for communications with Simpson in Florida, since they did not own a facsimile machine; Porteous agreed.[47]

112.    On March 24, 1992, Porteous wrote an introductory letter to Simpson, which he transmitted via facsimile.[48]

113.    Porteous' March 24, 1992 letter set forth the

---

[45]    See June 26,. 1996 deposition of United Kingdom attorney Peter Wise at page 11, line 18 through page 12, line 22, and pages 23 and 30-35, a copy of which is attached hereto and incorporated herein as exhibit 15.

[46]    See exhibit 15 at page 11, line 18 through page 12, line 22, and pages 23 and 30-35.

[47]    See exhibit 15 at page 36, lines 6-10.

[48]    See Porteous' March 24 letter to Simpson, a copy of which is attached hereto and incorporated herein as exhibit 16.

respective duties towards Plaintiffs of Porteous and Simpson.[49]

114.    Specifically, the March 24, 1992 letter detailed that Porteous represented Plaintiffs in the sale of their United Kingdom home, and included the address of said United Kingdom home.[50]

115.    The March 24, 1992 letter also detailed that Simpson represented Plaintiffs in the purchase of their United States home, and included the address of said United States home.[51]

116.    During the Florida Bar grievance process, Plaintiffs contacted Porteous concerning Simpson's allegations that Porteous had represented them in the PTW purchase.

117.    Porteous confirmed the respective duties of himself, Porteous, and Simpson, regarding the United Kingdom and United States real property transactions.[52]

118.    The March 24, 1992 letter further asked whether Plaintiffs needed original documents to support the obtaining of their permanent immigration status.[53]

119.    On March 25, 1992, Augspurger telephoned Simpson to

---

[49]    *See* exhibit 16.

[50]    *See* exhibit 16.

[51]    *See* exhibit 16.

[52]    *See* February 22, 1994 letter from Porteous to Plaintiffs, a copy of which is attached hereto and incorporated herein as exhibit 17.

[53]    *See* exhibit 17.

discuss the Stockton contract for PTW.[54]

120.    On April 2, 1992, Plaintiffs telephoned Simpson, asking about the status of the INS Forms.[55]

121.    This was the first time Plaintiffs had had any contact with Simpson since March 23, 1992.

122.    Simpson replied that the INS Forms had not yet arrived.

123.    Plaintiffs asked whether they needed to provide original supporting documents to the INS Forms, such as birth certificates.

124.    Simpson told Plaintiffs he would advise them on receipt of the INS Forms.

125.    On April 6, 1992, Simpson received the INS Forms and mailed them to Plaintiffs in the United Kingdom, with a cover letter.[56]

126.    Simpson's April 6, 1992 cover letter bore the reference: "Stirzaker purchase of Laughren property (USA)".[57]

127.    Simpson's April 6, 1992 cover letter instructed

---

[54]    *See* exhibit 11.

[55]    *See* exhibit 9.

[56]    *See* exhibit 3; exhibit 11; Simpson's April 6 cover letter, a copy of which is attached hereto and incorporated herein as exhibit 18.

[57]    *See* exhibit 3; exhibit 11; exhibit 18.

- 19 -

Plaintiffs to complete the forms and return them to him, Simpson.[58]

128.     However, in his May 12, 1993 letter to the Florida Bar, which he confirmed was true in his June 7, 1994 sworn testimony to the Florida Bar, Simpson claimed that he forwarded the INS Forms to Plaintiffs, and advised them to retain an attorney who specialized in immigration law to present their application to INS.[59]

129.     On April 6, 1992, Plaintiffs telephoned Simpson concerning the INS Forms.[60]

130.     Simpson asked Plaintiffs why they were so concerned about their permanent immigration status, since he had assured Plaintiffs that their permanent immigration status was automatic and guaranteed.

131.     Simpson told Plaintiffs he had mailed the INS Forms that same day, and instructed them to complete the forms and return them to him, Simpson.

132.     On April 6, 1992, Simpson wrote to Plaintiffs via Porteous' facsimile machine post box, requesting the telephone number of PTW's owners, the Laughrens.[61]

---

[58]     See exhibit 3; exhibit 11; exhibit 18.

[59]     See exhibit 2 at page _____ and exhibit 3.

[60]     See exhibit 9.

[61]     See Simpson's April 6, 1992 facsimile letter to Plaintiffs concerning the Laughrens' telephone number, a copy of which is attached hereto and incorporated herein as exhibit 19.

133.     Porteous telephoned Plaintiffs about Simpson's April 6, 1992 request about the Laughrens; Plaintiffs were totally unaware of the request or the reason for same.

134.     Plaintiffs called a friend in Sawgrass Country Club, obtained the number, and provided it to Porteous.

135.     On April 6, 1992, Porteous wrote to Simpson by facsimile, stating:

> Thank you for your recent communication.  Here is the Laughrens' phone number, 904-285-5053.[62]

136.     On April 9, 1992, Simpson forwarded by facsimile to Porteous' office a letter to Plaintiffs with five numbered paragraphs containing the Laughrens' terms for the purchase of PTW.[63]

137.     On April 10, 1992, Porteous received the April 9, 1992 letter (due to the U.K./U.S. time difference) and telephoned Plaintiffs to come and collect it.

138.     Plaintiffs reviewed Simpson's April 9, 1992 letter, and were shocked to receive same, where Simpson was asking whether to proceed with a contract for the purchase of real estate when Plaintiffs had not received the INS Forms, much less their permanent immigration status.

_____

[62]   *See* Porteous' April 6 letter to Simpson, a copy of which is attached hereto and incorporated herein as exhibit 20.

[63]   *See* Simpson's April 9 letter to Plaintiffs, a copy of which is attached hereto and incorporated herein as exhibit 21; exhibit 1 at page 8, paragraph 2.

139.    On April 10, 1992, Plaintiffs telephoned Simpson at Simpson's home; Simpson's son said Simpson was unavailable and to telephone Simpson at his office the following day.[64]

140.    On April 10, 1992, Plaintiffs mailed a letter to Simpson containing thirteen questions regarding his April 9, 1992 letter.[65]

141.    Plaintiffs' April 10, 1992 letter confirmed that they would not consider purchasing PTW (or any other property) until they had obtained their permanent immigration status and an Inspection of PTW (or any other property) had been satisfactorily undertaken.[66]

142.    Plaintiffs specified what they expected the Inspection to encompass, including, in addition to the normal structural examination: (1) plumbing; (2) electrical systems; (3) drainage; (4) air conditioning; (5) heating; and, (6) appliances.[67]

143.    On April 11, 1992, Plaintiffs telephoned Simpson, and spoke with him for more than ten minutes.[68]

144.    The April 11, 1992 conversation encompassed everything in Plaintiffs' April 10, 1992 letter, including their

---

[64]    See exhibit 9.

[65]    See Plaintiffs' April 10, 1992 letter to Simpson, a copy of which is attached hereto and incorporated herein as exhibit 22.

[66]    See exhibit 22.

[67]    See exhibit 22.

[68]    See exhibit 9.

- 22 -

permanent immigration status.

145.     Plaintiffs repeated that they wanted the Inspection, which was to include the additional items referenced in their April 10, 1992 letter.

146.     Simpson agreed with all of Plaintiffs' requests regarding the Inspection.

147.     Simpson repeated his permanent immigration status guarantee.

148.     On April 14, 1992, Plaintiffs went to Porteous' office to have their April 10, 1992 letter forwarded to Simpson by facsimile.

149.     Prior to its April 14, 1992 transmission, Plaintiffs' April 10, 1992 letter was reduced to typewritten form, the thirteen questions were condensed to ten questions, and those ten questions were then transmitted by facsimile to Simpson.[69]

150.     On the same date, Simpson replied, via facsimile, to Plaintiffs' typewritten letter from Porteous' office.[70]

151.     Simpson's reply was not responsive to all thirteen questions, but stated that all the questions would be answered in the new contract which he was drawing up with Ahern, the Laughrens'

---

[69]     See Plaintiffs' April 14, 1992 letter to Simpson, a copy of which is attached hereto and incorporated herein as exhibit 23.

[70]     See Simpson's April 14, 1992 letter to Plaintiffs, a copy of which is attached hereto and incorporated herein as exhibit 24.

- 23 -

attorney.[71]

152.     On the morning of April 15, 1992, Ahern and the Laughrens went to Simpson's office, at Simpson's invitation, to negotiate the terms and changes to the Stockton PTW Contract.[72]

153.     The outcome of the April 15, 1992 negotiations was a contract for the purchase and sale of PTW prepared by Ahern (hereafter the "Ahern PTW Contract").[73]

154.     The Ahern PTW Contract did not contain the Contingencies.[74]

155.     In fact, Simpson agreed to an "As Is" clause with no right of inspection, as opposed to the Inspection demanded by Plaintiffs, which included, in addition to the normal structural examination: (1) plumbing; (2) electrical systems; (3) drainage; (4) air conditioning; (5) heating; and, (6) appliances.[75]

156.     The Ahern PTW Contract stated that there were no latent defects the sellers knew of.[76]

_____

[71]     See exhibit 24.

[72]     See Ahern's May 12, 1993 letter to the Florida Bar, a copy of which is attached hereto and incorporated herein as exhibit 25; exhibit 2 at pages 28 through 29; exhibit 14 at page 5, lines 20-21.

[73]     See Ahern PTW Contract, a copy of which is attached hereto and incorporated herein as exhibit 26.

[74]     See exhibit 26.

[75]     See exhibit 26.

[76]     See exhibit 26.

157.     Simpson also incorporated into the Ahern PTW Contract an Arvida Realty Sales (hereafter "Arvida") brochure, which stated PTW was:

> One owner, lovingly cared for and in excellent condition.[77]

158.     Simpson further agreed to a provision that "Buyers acknowledge that they have inspected the property and accepted it in its present As Is condition."[78]

159.     Plaintiffs were in the United Kingdom and thus unable to inspect PTW.[79]

160.     Simpson knew that Plaintiffs were in the United Kingdom and thus unable to inspect PTW.[80]

161.     At 4:12 p.m. United States East Coast time on April 15, 1992, Plaintiffs telephoned Simpson.[81]

162.     This was a routine status conference/conversation.

163.     Simpson did not advise Plaintiffs of the morning's negotiations.

164.     In fact, Plaintiffs did not learn of the April 15,

---

[77]   *See* exhibit 26; exhibit 4 at page 60, line 13 through page 61, line 12; Ahern's June 28, 1996 affidavit (in support of Simpson's July 3, 1996 motion for summary judgment), a copy of which affidavit is attached hereto and incorporated herein as exhibit 27.

[78]   *See* exhibit 26.

[79]   *See* exhibit 8 and exhibit 9.

[80]   *See* exhibit 9.

[81]   *See* exhibit 9.

1992 negotiations until the June 7, 1994 Florida Bar grievance committee hearing, which resulted from Plaintiffs' complaint against Simpson to the Florida Bar.

165.     On April 16, 1992, Ahern transmitted to Simpson by facsimile the Ahern PTW Contract as "negotiated" on April 15, 1992, together with a facsimile cover letter.[82]

166.     Ahern's cover letter to his facsimile transmission asked Simpson to review the Ahern PTW Contract and provide his comments.[83]

167.     On April 21, 1992, Plaintiffs telephoned Simpson to ask about their April 10 letter and its thirteen questions.[84]

168.     Simpson told Plaintiffs that the Inspection on PTW, which they had demanded, had been completed, and that PTW was defect free and in excellent condition.[85]

169.     Plaintiffs requested a copy of the Inspection.

170.     Simpson told Plaintiffs that the Inspection was in his files, but he was not permitted to send a copy out of the United States.

171.     However, no Inspection had been, nor was ever,

---

[82]     *See* Ahern's April 16 facsimile cover letter to Simpson, a copy of which is attached hereto and incorporated herein as exhibit 28; exhibit 26.

[83]     *See* exhibit 28.

[84]     *See* exhibit 9.

[85]     *See* exhibit 25.

undertaken.[86]

172.        Simpson also asked whether Plaintiffs had received the INS Forms from Simpson; they said they had not.

173.        Later that day, April 21, 1992, Plaintiffs received the INS Forms from Simpson.

174.        On April 22, 1992, Simpson forwarded by facsimile to Porteous the Ahern PTW Contract and Ahern's cover letter.[87]

175.        The inclusion of Ahern's cover letter assured Plaintiffs that Simpson had reviewed the Ahern PTW Contract.

176.        The Ahern PTW Contract, transmitted via facsimile from Ahern to Simpson and via facsimile from Simpson to Porteous, was illegible.[88]

177.        On April 22, 1992, Porteous mailed the facsimile Ahern PTW Contract to Plaintiffs, with a cover letter.[89]

178.        On April 23, 1992, Plaintiffs went to Porteous' office.

179.        Plaintiffs did not recognize the Ahern PTW Contract as a legal document.

180.        Plaintiffs therefore telephoned Simpson at his

---

[86]    *See* exhibit 25.

[87]    *See* exhibit 26 and exhibit 28.

[88]    *See* exhibit 26.

[89]    *See* Porteous' April 22 letter to Plaintiffs, a copy of which is attached hereto and incorporated herein as exhibit 29.

office from Porteous' office.[90]

181.       Plaintiffs spoke to Simpson via speakerphone.[91]

182.       Plaintiffs told Simpson they could not read the Ahern PTW Contract.

183.       Simpson told Plaintiffs:

> to sign it anyway and return it to me a.s.a.p.
> because I need to use it as proof to the INS
> that you are serious about purchasing full
> time residential property in the United
> States.

184.       Simpson also told Plaintiffs to have Porteous witness their signatures on the Ahern PTW Contract.

185.       On this the only occasion that Porteous spoke to Simpson, Porteous said he was not comfortable witnessing Plaintiffs' signatures to a document which he could not read.

186.       Simpson screamed at Porteous that:

> I'm their attorney in this U.S. of A., which
> is a democracy.  Just get them to sign the God
> damned thing and send it back to me a.s.a.p.

187.       Simpson then hung up the phone.

188.       Since Porteous represented Plaintiffs only in the sale of their United Kingdom home, and since he, Porteous, had clearly delineated the respective duties of himself and Simpson in his March 24, 1992 letter to Simpson, Porteous complied with Simpson's demand.

---

[90]    *See* exhibit 1 at page 17, paragraph 1.

[91]    *See* exhibit 1 at page 17, paragraph 1.

189.    In other words, Porteous was not acting as Plaintiffs' attorney in any capacity in relation to any legal matter in the United States.[92]

190.    Moreover, if Plaintiffs had had access to any other facsimile machine, Porteous would not have been involved with any legal matter in the United States, whether for Plaintiffs or anyone else.[93]

191.    On April 27, 1992, Plaintiffs wrote to Simpson by facsimile that they had approved the Ahern PTW Contract in principle, insofar as it supported their permanent immigration status.[94]

192.    Again, Porteous undertook to follow Simpson's instructions as to witnessing Plaintiffs' signatures because he, Porteous, had clearly delineated the respective duties of himself and Simpson in his March 24, 1992 letter to Simpson.

193.    Again, Porteous was not acting as Plaintiffs' attorney in any capacity in relation to any legal matter in the United States.[95]

194.    Plaintiffs' letter said a deposit on PTW (hereafter the "Deposit") was also being forwarded, and that Simpson should

---

[92]    *See* exhibit 15.

[93]    *See* exhibit 15.

[94]    *See* Plaintiffs' April 27 letter to Simpson, a copy of which is attached hereto and incorporated herein as exhibit 30.

[95]    *See* exhibit 15.

- 29 -

retain the Deposit until a final PTW contract was drawn up.[96]

195.     In fact, the Ahern PTW Contract was the final PTW contract.[97]

196.     Neither Plaintiffs nor Porteous knew there had been any negotiations concerning the PTW purchase.

197.     On April 28, 1992, Simpson wrote to Plaintiffs that they must sign the Ahern PTW Contract, and Federal Express it to him, Simpson, with the $75,000 Deposit.[98]

198.     On April 30, 1992, Plaintiffs telephoned Simpson.[99]

199.     This was a status conference/conversation, which included Plaintiffs' permanent immigration status, the PTW purchase, Simpson making an offer pursuant to the Stockton PTW Contract, and the inventory of PTW personal property.

200.     Simpson repeated the results of the Inspection.

201.     As far as Simpson making an offer on PTW pursuant to Plaintiffs' April 10, 1992 letter to Simpson, Simpson said he would do it, but this was not the right time.

202.     Plaintiffs were not concerned about the $75,000 Deposit being non-refundable because: (1) Simpson had guaranteed them permanent immigration status; (2) Simpson had assured them the

---

[96]     *See* exhibit 30.

[97]     *See* exhibit 26.

[98]     *See* Simpson's April 28, 1992 letter to Plaintiffs, a copy of which is attached hereto and incorporated herein as exhibit 31.

[99]     *See* exhibit 9.

- 30 -

Inspection had been carried out and that PTW was defect free and in excellent condition; and (3) they were planning to pay cash for PTW, so if Plaintiffs' $250,000 offer (per their April 10, 1992 letter) was accepted, the Deposit would merely reduce the cash to close.

203.    On May 6, 1992, Plaintiffs Federal Expressed the following to Simpson: (1) a two page hand-written letter, informing him completion of the PTW purchase was subject to a satisfactory detailed home survey, as previously detailed to Simpson;[100] (2) a check for $35,000 as part of the Deposit, made out to K.A. Simpson, Trust Account; (3) a signed copy of the Ahern PTW Contract;[101] (4) the completed INS Forms; and, (5) Plaintiffs' hand-written notes on Simpson's April 6 cover letter.[102]

204.    On May 7, 1992, Plaintiffs telephoned Simpson to ask again for a copy of the Inspection.[103]

205.    Simpson repeated that he had already told Plaintiffs he could not send a copy outside the United States.

206.    Simpson also repeated to Plaintiffs what he had

---

[100]    *See* Plaintiffs' May 6, 1992 cover letter to Simpson, a copy of which is attached hereto and incorporated herein as exhibit 32.

[101]    *See* signed copy of the Ahern PTW Contract, a copy of which is attached hereto and incorporated herein as exhibit 33.

[102]    *See* Plaintiffs' hand written notes on Simpson's April 6, 1992 cover letter, a copy of which is attached hereto and incorporated herein as composite exhibit 34.

[103]    *See* exhibit 9.

- 31 -

previously told them, that PTW was defect free and in excellent condition.

207.     On May 12, 1992, Simpson noted on Plaintiffs' May 6, 1992 letter his May 12, 1992 receipt of the Ahern PTW Contract signed by Plaintiffs.[104]

208.     Simpson dated the Ahern PTW Contract on May 12, 1992.[105]

209.     On May 13, 1992, Simpson contacted INS and learned that, contrary to his repeated guarantees to Plaintiffs, they could not obtain automatic entry into and permanent residency in the United States.[106]

210.     Later on May 13, 1992, Simpson telephoned United States immigration attorney David Vedder.[107]

211.     Thereafter on May 13, 1992, Simpson wrote to David Vedder, that he had discussed, with Plaintiffs that morning, his, Vedder's, representation of Plaintiffs regarding their permanent

--------

[104]   See Simpson's notations on Plaintiffs' May 6, 1992 letter, a copy of which is attached hereto and incorporated herein as exhibit 35.

[105]   See exhibit 26.

[106]   See Simpson's May 13, 1992 INS file notes, copies of which are attached hereto and incorporated herein as composite exhibit 36.

[107]   See Simpson's May 13 Vedder file notes, copies of which are attached hereto and incorporated herein as composite exhibit 37.

immigration status.[108]

212.     Simpson never telephoned Plaintiffs in the United Kingdom, either on May 13, 1992 or at any other time.

213.     On May 15, 1992, Ahern amended the Ahern PTW Contract to allow the Laughrens at least thirty (30) days prior notice of closing, and transmitted same via facsimile to Simpson with a cover letter.[109]

214.     Despite having learned Plaintiffs could not obtain automatic entry into and permanent residency in the United States, and despite knowing that no Inspection had been undertaken, Simpson did not seek to amend the Ahern PTW Contract to include the Contingencies.[110]

215.     Despite having learned Plaintiffs could not obtain automatic entry into and permanent residency in the United States, and despite knowing that no Inspection had been undertaken, Simpson proceeded with the Ahern PTW Contract.[111]

216.     Plaintiffs did not ask Simpson to amend the Ahern

---

[108]     *See* Simpson's May 13, 1992 letter to David Vedder, Esq., a copy of which is attached hereto and incorporated herein as exhibit 38.

[109]     *See* Ahern's May 15, 1992 cover letter to Simpson, a copy of which is attached hereto and incorporated herein as exhibit 39; exhibit 26.  Plaintiffs' only copy of the Ahern PTW Contract is the one as amended hereto; the amendment was made to the Ahern PTW Contract which Plaintiffs had signed and Federal Expressed it back to Simpson on May 6, 1992.

[110]     *See* exhibit 26.

[111]     *See* exhibit 26.

PTW Contract to include the Contingencies because: (1) Simpson had repeatedly told Plaintiffs their permanent immigration status was automatic; (2) Simpson had told them the Inspection on PTW, which they had demanded, had been completed, and that PTW was defect free and in excellent condition; (3) the Ahern PTW Contract expressly stated there were no latent defects the sellers knew of; (4) the Ahern PTW Contract stated PTW was in excellent condition; and, (5) the sale of Plaintiffs' United Kingdom home was underway.

217.    On May 19, 1992, Simpson mailed the amended Ahern PTW Contract to Plaintiffs at their United Kingdom home address, with a cover letter.[112]

218.    By forwarding the amended Ahern PTW Contract to Plaintiffs, Simpson demonstrated his representation of Plaintiffs in the purchase of PTW.

219.    Porteous never saw the amended Ahern PTW Contract.

220.    On May 26, 1992, Plaintiffs received an unsolicited May 13, 1992 letter from attorney David Vedder.[113]

221.    This May 13, 1992 letter, received by Plaintiffs on May 26, 1992, was the first time Plaintiffs had ever heard of, or from, either attorney Vedder or any other immigration attorney other than Simpson.

---

[112]    *See* Simpson"'s May 19, 1992 letter to Plaintiffs, a copy of which is attached hereto and incorporated herein as exhibit 40.

[113]    *See* May 13, 1992 letter to Plaintiffs from David Vedder, a copy of which is attached hereto and incorporated herein as exhibit 41.

222.    Vedder's letter said Simpson had spoken to him, Vedder, that morning, regarding his, Vedder's, representation of Plaintiffs for their permanent immigration status.[114]

223.    Simpson had never spoken to Plaintiffs about his contact or conversation(s) with Vedder.

224.    Moreover, Plaintiffs had never authorized Simpson to approach any other attorney to represent them in any matter, including immigration.

225.    On May 27, 1992, Plaintiffs initialled the amendment and returned it to Simpson, with their cover letter, together with the forty thousand dollars ($40,000) bank draft balance of the seventy-five thousand dollar ($75,000) Deposit.[115]

226.    Plaintiffs' May 27, 1992 cover letter communicated their initial alarm over Vedder's involvement.

227.    However, and as set forth in their May 27, 1992 letter, Plaintiffs believed Simpson's guarantee of permanent immigration status by no later than the end of 1992, and therefore trusted Simpson had arranged with Vedder to timely complete the process.[116]

228.    As the day progressed, Plaintiffs became more and

---

[114]    *See* exhibit 41.

[115]    *See* Plaintiffs' May 27, 1992 letter to Simpson, a copy of which is attached hereto and incorporated herein as exhibit 42; exhibit 26.

[116]    *See* exhibit 42.

- 35 -

more troubled about their permanent immigration status.

229.    At 11:19 p.m., United Kingdom time, on May 27, 1992, Plaintiffs telephoned the Laughrens.[117]

230.    Plaintiffs told the Laughrens they were going to take their United Kingdom home off the market and cancel their plans to live in Florida.

231.    The Laughrens told Plaintiffs they would speak to Ahern about finding a local (Jacksonville) immigration law attorney, who could obtain permanent immigration status for Plaintiffs by no later than the end of 1992.

232.    On May 28, 1992, the Laughrens telephoned Plaintiffs in the United Kingdom, and told Plaintiffs Ahern had arranged for them to consult Jacksonville immigration attorney David Fletcher during Plaintiffs' upcoming August 1992 Sawgrass Country Club vacation.[118]

233.    On May 28, 1992, the Laughrens telephoned Simpson, Plaintiffs' attorney, and asked him to forward all of Plaintiffs' visa documents to Fletcher.[119]

234.    On May 29, 1992, Plaintiffs telephoned Fletcher at

_____

[117]    *See* exhibit 9.

[118]    *See* Mrs. Stirzaker's contemporaneous diary notes, a copy of which is attached hereto and incorporated herein as composite exhibit 43.

[119]    *See* Simpson's May 28, 1992 Laughren Call file notes, copies of which are attached hereto and incorporated herein as composite exhibit 44.

8:30 a.m. United States East Coast time, to discuss Simpson's previous work on their permanent immigration status.[120]

235.     Plaintiffs told Fletcher that Simpson had already submitted their INS Forms to the United States Immigration and Naturalization Service (hereafter the "INS").

236.     However, Simpson needed help in getting the INS Forms finalized by the December 1992 date he had promised Plaintiffs.

237.     Plaintiffs believed that Simpson had submitted their INS Forms to the INS on or about May 12, 1992.

238.     On May 29, 1992, Plaintiffs telephoned Simpson at 3:06 p.m., United States East Coast time to tell him that they were going to use Fletcher instead of Vedder, because Fletcher was in Jacksonville where Vedder was in Daytona Beach.[121]

239.     Simpson told Plaintiffs that he would work in tandem with Fletcher to obtain Plaintiffs' permanent immigration status before the end of 1992.

240.     On June 2, 1992, Simpson wrote to Fletcher, advising him that his, Simpson's office, represented the Stirzakers, and requesting information on _starting_ their permanent immigration status process.

---

[120]     _See_ exhibit 9.

[121]     _See_ Simpson's office notes of Plaintiffs' May 29th, 1992 telephone call to Simpson, a copy of which is attached hereto and incorporated herein as exhibit 45.

241.    On June 15, 1992, Simpson's billing records reflect that he reviewed Plaintiffs' May 27, 1992 letter which quoted his guarantee of "visa status by the end of 1992 at the latest."[122]

242.    On June 15, 1992, Simpson telephoned Vedder and Ahern for a total of ninety minutes;[123] Plaintiffs surmise that Simpson asked Vedder if he, Vedder, could find some way of obtaining permanent immigration status for Plaintiffs as soon as possible.

243.    On June 18, 1992, Fletcher wrote to Simpson about Simpson's prior representation of Plaintiffs.[124]

244.    Fletcher advised Simpson that he had spoken both to the Laughrens and Mr. Stirzaker, who had all told him, Fletcher, that Simpson had previously been working on Plaintiffs' permanent immigration status.

245.    On June 19, 1992, Ahern sent to Simpson the commitment for title insurance for PTW, with a cover letter asking Simpson to review same.[125]

246.    Ahern drew up the commitment in his capacity as Jacksonville agent for Commonwealth Land Title Insurance Company.

---

[122]    *See* exhibit 11.

[123]    *See* exhibit 11.

[124]    *See* Fletcher's June 18, 1992 letter to Simpson, a copy of which is attached hereto and incorporated herein as exhibit 46.

[125]    *See* Ahern's June 19, 1992 cover letter to Simpson, enclosing the commitment for title insurance for PTW, a copy of which is attached hereto and incorporated herein as exhibit 47.

247.     Subsequent to closing, Ahern, again in his capacity as Jacksonville agent for Commonwealth Land Title Insurance Company, drew up the title insurance policy.

248.     On June 22, 1992, Simpson airmailed the commitment for PTW to Plaintiffs' United Kingdom home address with a cover letter.[126]

249.     By forwarding the commitment for PTW to Plaintiffs, Simpson demonstrated his representation of Plaintiffs in the purchase of PTW.

250.     Porteous never saw the Commitment.

251.     The Ahern PTW Contract required Simpson, for the Buyer [Plaintiffs] to arrange a land survey of PTW.[127]

252.     Not only was no Inspection undertaken, but Simpson did not even arrange for a land survey of PTW.

253.     Instead, Simpson asked Ahern to arrange for the land survey.[128]

254.     Ahern selected his next-door neighbor H.A. Durden to perform the land survey.

255.     On June 24, 1992, Durden performed the land survey

---

[126]     *See* Simpson's June 22, 1992 cover letter to Plaintiffs, a copy of which is attached hereto and incorporated herein as exhibit 48.

[127]     *See* exhibit 26.

[128]     *See* exhibit 47.

of PTW (hereafter the "Durden Land Survey").[129]

256.     The Durden Land Survey did not include: (1) the original 1980 plan outline of PTW; (2) a later extensive screen porch at the rear of PTW; and, (3) a one thousand two hundred ten (1,210) square foot addition to PTW constructed, contrary to building code standards, by Mr. Laughren in 1985.[130]

257.     The Durden Land Survey made it appear PTW was entirely constructed in 1985, as opposed to in various stages prior to 1985.[131]

258.     On June 26, 1992, Ahern hand-delivered the Durden Land Survey to Simpson with a cover letter asking Simpson to review the Durden Land Survey.[132]

259.     On June 29, 1992, Simpson airmailed the Durden Land Survey to Plaintiffs' United Kingdom home address with a cover letter.[133]

260.     By forwarding the Durden Land Survey to Plaintiffs, Simpson demonstrated his representation of Plaintiffs in the purchase of PTW.

---

[129]   *See* Durden Land Survey, a copy of which is attached hereto and incorporated herein as exhibit 49.

[130]   *See* exhibit 49.

[131]   *See* exhibit 49.

[132]   *See* Ahern's June 26, 1992 cover letter to Simpson, a copy of which is attached hereto and incorporated herein as exhibit 50.

[133]   *See* Simpson's June 29, 1992 cover letter, a copy of which is attached hereto and incorporated herein as exhibit 51.

261.     Porteous never saw the Durden Land Survey.

262.     Plaintiffs understood the Durden Land Survey to be just that, a land survey.

263.     Plaintiffs never considered the Durden Land Survey to be the Inspection they had always demanded of Simpson, including, but not limited to, their April 10, 1992 and April 14, 1992 letters.[134]

264.     On July 20, 1992, Plaintiffs Federal Expressed the following to Fletcher: (1) a completed visa questionnaire; (2) copies of all supporting documents required by the questionnaire; and, (3) a cover letter.[135]

265.     On July 20, 1992 and July 31, 1992, Plaintiffs telephoned Fletcher to discuss the documents Federal Expressed to him and to ask whether they needed to bring any other documents to Florida regarding their permanent immigration status.[136]

266.     On August 2, 1992, Plaintiffs flew from the United Kingdom to Florida.[137]

267.     On or about August 6, 1992, Plaintiffs had a two hour office conference with Fletcher.

---

[134]     *See* exhibit 22 and exhibit 23.

[135]     *See* Plaintiffs' July 20, 1992 cover letter to Fletcher, a copy of which is attached hereto and incorporated herein as composite exhibit 52.

[136]     *See* exhibit 9.

[137]     *See* exhibit 8.

- 41 -

268.    Fletcher told Plaintiffs that: (1) permanent immigration status in the United States was formerly automatic for United Kingdom citizens, but had been discontinued some fifteen years earlier; (2) Simpson dated the Ahern PTW Contract on May 12; and, (3) the signed Ahern PTW Contract did not contain the Contingencies, including, of course, permanent immigration status for Plaintiffs.

269.    At this time, neither Plaintiffs nor Fletcher were aware that Simpson had failed to submit the INS Forms to the INS.

270.    Immediately after leaving Fletcher's office, Mrs. Stirzaker telephoned Simpson to advise him of the terrible news they received from Fletcher about their permanent immigration status.

271.    Simpson screamed abuse at Mrs. Stirzaker, who terminated the call.[138]

272.    On August 7, 1992, Plaintiffs took to Simpson's office, in the form of a letter, their handwritten contemporaneous notes of their meeting with Fletcher.[139]

273.    Simpson's office told Plaintiffs that Simpson was not available to see them because he had left for his annual

---

[138]   *See* June 7, 1994 testimony of Norma Stirzaker to The Florida Bar Grievance Committee at page 105, a copy of which is attached hereto and incorporated herein as exhibit 53.

[139]   *See* Plaintiffs' contemporaneous notes of meeting with Fletcher, copies of which are attached hereto and incorporated herein as composite exhibit 54.

vacation in North Carolina, and would not return until mid-September.

274.     During this visit to Florida, Plaintiffs passed PTW each day, since it was on their route out of Sawgrass Country Club.

275.     Plaintiffs attempted to visit PTW on numerous occasions, but only gained entry three times.

276.     On each occasion, Mrs. Laughren took Plaintiffs round the back of PTW, into the screened porch.

277.     On one of those occasions, Plaintiffs negotiated with the Laughrens to buy, for five thousand dollars ($5,000), the personal property referenced in Plaintiffs' April 10, 1992 and April 14, 1992 letters to Simpson.

278.     Plaintiffs did not, and would not have attempted to, inspect PTW at any time, since they had instructed Simpson to obtain the Inspection and he, Simpson, had told them the Inspection had already been completed.

279.     Moreover, Mrs. Laughren did not permit Plaintiffs to enter the house unless supervised by her or to have any free access thereto, on the basis that Mr. Laughren was dying, following unsuccessful heart bypass surgery.

280.     In fact, as Mr. Laughren's medical records disclose, Mr. Laughren never had any heart surgery, at that time or ever.

281.     During all five visits, Plaintiffs saw no more than the personal property referenced in Plaintiffs' April 10, 1992 and April 14, 1992 letters to Simpson.

282.     On August 14, 1992, the Laughrens locked up PTW and, like Simpson, went to North Carolina on vacation.

283.     On August 28, 1992, the Laughrens returned to Sawgrass Country Club.

284.     In September 1992, Mrs. Nancy Laughren telephoned Plaintiffs in the United Kingdom; Mrs. Laughren was hysterical.

285.     Mrs. Laughren asked Plaintiffs if they would release eighteen thousand dollars ($18,000) from the $75,000 Deposit "to pay for emergency life-saving heart surgery for Mr. Laughren"; Plaintiffs agreed.

286.     Plaintiffs told Mrs. Laughren to contact Simpson so he could arrange for the release to Mrs. Laughren of $18,000 of the $75,000 Deposit that was being held until the closing on PTW (hereafter the "PTW Closing").

287.     Moreover, Plaintiffs later learned that Mrs. Laughren's request had nothing to do with emergency life-saving surgery.

288.     Plaintiffs in fact learned that the Laughrens were in default on their eighty-four thousand dollar ($84,000) mortgage on PTW (hereafter the "Laughren PTW Mortgage") with First Union Bank.

289.     FUNB had foreclosed on the Laughren PTW Mortgage in February 1992.

290.     Ahern had negotiated a six month extension of time for the Laughrens to bring the Laughren PTW Mortgage current.

- 44 -

291.    In September 1992, the Laughrens needed $18,000 to bring the Laughren PTW Mortgage current.

292.    In September 1992, the Laughrens did not have $18,000 to bring the Laughren PTW Mortgage current.

293.    On September 16, 1992, Simpson provided Ahern the details of Porteous' office facsimile "post box".

294.    This was in order that Ahern could transmit to Porteous' office the documents for the release of the $18,000 to the Laughrens prior to the PTW Closing.

295.    Simpson provided this information to Ahern even though Simpson represented Plaintiffs and Ahern represented the opposing parties, the Laughrens, in the PTW purchase.

296.    Thereafter, Ahern altered Plaintiffs' verbal agreement, to release the $18,000 for the emergency life-saving surgery, to a written agreement, to pay $18,000 for personal property of the Laughrens.[140]

297.    September 16, 1992 was "Black Wednesday" in the United Kingdom, when the Pound Sterling dropped dramatically in value against the United States dollar.

298.    As a result of "Black Wednesday" and its effect on their United Kingdom finances, Plaintiffs needed an additional seventy-five thousand dollars ($75,000) to complete the two hundred

_____

[140]    *See* September 1992 second addendum to the Ahern PTW Contract (hereafter the "Second Addendum"), a copy of which is attached hereto and incorporated herein as exhibit 55.

- 45 -

ninety-nine thousand dollar ($299,000) purchase of PTW.

299.     Plaintiffs then decided to seriously consider taking out a mortgage to complete the purchase of PTW.

300.     On September 21, 1992, Plaintiffs forwarded to Ahern by facsimile the release addendum for the $18,000 signed by Plaintiffs.[141]

301.     At that time, the only PTW personal property Plaintiffs had seen were those items referenced in their April 10, 1992 and April 14, 1992 letters to Simpson, specifically: (1) large television in gallery; (2) all other televisions, stereos, and radios; (3) all minor domestic electrical items, such as kettles, coffee makers, toasters, vacuum cleaners, and hostess trolley; (4) all garden equipment; (5) ride on mower; and, (6) electrical gardening implements and general gardening tools.

302.     On November 10, 1992, Plaintiffs were approved for a one hundred ten thousand dollar ($110,000) mortgage by Robert Castro of Castro Mortgage Associates, Inc. as part of the purchase price of PTW.

303.     This was the same Robert Castro whom Plaintiffs had met on March 19, 1992, and who had qualified Plaintiffs for a mortgage on 9008.

304.     On November 10, 1992, Castro forwarded to Plaintiffs by facsimile for Plaintiffs' signatures, mortgage documents bearing

---

[141]     *See* September 21, 1992 release addendum, a copy of which is attached hereto and incorporated herein as exhibit 56.

an interest rate of eight and one half percent (8.5%).

305.    On December 2, 1992, Plaintiffs telephoned Simpson at 2:00 p.m. United States East Coast time.[142]

306.    Plaintiffs told Simpson they had arranged for a mortgage to complete their purchase of PTW (hereafter the "Castro PTW Mortgage").

307.    Plaintiffs told Simpson to expect contact from Castro.

308.    Simpson immediately notified Ahern about the Castro PTW Mortgage.[143]

309.    The Laughrens knew that PTW contained many serious material defects.

310.    Ahern, the Laughrens' long time close family friend, knew that PTW contained many serious material defects, not least because Ahern's wife assisted Mrs. Laughren is concealing the defects, including, but not limited to: (1) affixing a mirror on the entire width and height of the fireplace chimneybreast to cover water damage to the wall; (2) painting over water damage stains on

---

[142]    *See* exhibit 9.

[143]    *See* Ahern's June 3, 1994 initial brief to the Florida Fifth District Court of Appeal at page 6, line 5, in the case styled <u>Jimmy Laughren and Nancy S. Laughren vs. Stanley Stirzaker and Norma Stirzaker</u>, St. Johns County Circuit court case number 93-1018, and later consolidated with the case styled <u>Stanley Stirzaker and Norma Stirzaker vs. Jimmy Laughren and Nancy S. Laughren, Kurt Andrew Simpson, Kurt Andrew Simpson, P.A., et al</u>, St. Johns County Circuit court case number 93-1065, a copy of the pertinent portion of which initial brief is attached hereto and incorporated herein as exhibit 57.

interior walls, ceilings, and window frames; (3) affixing carpeting over a crack in the foundation of the concrete floor of the entire house; (4) affixing duct tape over the rot and bug damage to window frames, base boards, door frames, and exterior wood siding; (5) painting over the duct tape to match the applicable decor so that the duct tape would not be noticeable; (6) repeatedly painting the walls and ceilings due to water damage as a result of rain; (7) covering leaks in the roof with plastic and nailing back the shingles; (8) placing and replacing blankets under the shingles to soak up the water from the roof leaks; (9) affixing the window blinds to the frames so the damage to the window frames, glass, and seals could not be seen; (10) arranging the furniture so that water seeping up through the foundations could not be detected; (11) applying concrete around the fireplace chimneybreast and the hearth to prevent water seeping out.

311.    Bill Mathey, a neighbor of the Laughrens whose driveway adjoins the Laughrens' driveway, observed Ahern's wife assisting Mrs. Laughren in concealing the defects.

312.    Ahern, a real estate attorney, knew that Castro would require standard documentation in support of the Castro PTW Mortgage, such as (hereafter the "Mortgage Documentation"): (1) a professional appraisal of PTW to estimate its current market value; (2) a professional home inspection report of PTW to determine its physical condition; (3) a roof inspection report which would show whether PTW's roof had a minimum life expectancy of two years; (4)

- 48 -

a wood destroying organism report which would show whether there was any wood destroying organism damage in PTW; (5) a land survey which would show the initial construction of PTW and later additions to the property; and, (6) a title inspection by a title insurance company of Castro's choice.

313.    None of the Castro Mortgage Documentation items were included in the Ahern PTW Contract.[144]

314.    The Laughrens knew that, if the Castro Mortgage Documentation items were obtained by any independent third party, Plaintiffs would, as a result, not complete the purchase of PTW.

315.    Ahern knew that, if the Castro Mortgage Documentation items were obtained by any independent third party, Plaintiffs would, as a result, not complete the purchase of PTW.

316.    On December 3, 1992, Plaintiffs received an unexpected telephone call from Mr. Laughren.

317.    Mr. Laughren told Plaintiffs that Simpson had told Ahern about the Castro PTW Mortgage.

318.    Mr. Laughren offered Plaintiffs an interest-free seventy-five thousand dollar ($75,000) purchase money mortgage (hereafter the "Laughren Purchase Money Mortgage").

319.    Mr. Laughren's offer was designed to prevent the obtaining of the Castro Mortgage Documentation items and Plaintiffs' concomitant cancellation of the Ahern PTW Contract.

---

[144]    *See* exhibit 26.

- 49 -

320.     In December 1992, Ahern prepared documentation of the Laughren Purchase Money Mortgage.[145]

321.     Ahern forwarded the Laughren Purchase Money Mortgage documentation to Simpson for his review and approval.

322.     The PTW Closing had been scheduled for December 18, 1992.

323.     On December 18, 1992, Plaintiffs migrated from the United Kingdom to the United States.[146]

324.     Plaintiffs expected to take possession of PTW on their arrival.

325.     Plaintiffs' flight was delayed, and they did not reach PTW until 10:30 p.m.

326.     Plaintiffs were shocked to find that the Laughrens were still in possession of PTW.

327.     The Laughrens told Plaintiffs that the PTW Closing had been postponed until January 4, 1993.

328.     On December 19, 1992, Plaintiffs met with Simpson, who confirmed the postponement of the PTW Closing until January 4, 1993.

329.     The PTW Closing was not postponed for Plaintiffs, but for the Laughrens, since the owner of the house the Laughrens

---

[145]   *See* documentation of the Laughren Purchase Money Mortgage, a copy of which is attached hereto and incorporated herein as exhibit 58.

[146]   *See* exhibit 8.

were purchasing, located at 2 Cove Road, Sawgrass Country Club (hereafter the "Cove Road House"), would not close that purchase until after the end of the year.

330.     As a result of the unexpected postponement, Plaintiffs had to rent a condominium from December 19, 1992 through January 7, 1993.

331.     During the time between their arrival on December 18, 1992 and the PTW Closing (hereafter the "Pre-PTW Closing Time"), Plaintiffs heard unsavory rumors about PTW and the Laughrens (hereafter the "Rumors").

332.     As a result of the Rumors, Plaintiffs repeatedly went to PTW in an attempt to gain entrance, but were unsuccessful.

333.     During the Pre-PTW Closing Time, Plaintiffs repeatedly asked Simpson to cancel or postpone the PTW Closing until they had investigated the Rumors.

334.     Despite having postponed the PTW Closing for the Laughrens, Simpson refused to postpone or cancel the PTW Closing for Plaintiffs to investigate the Rumors.

335.     Between December 18, 1992 and January 4, 1993, Simpson repeatedly threatened Plaintiffs that they would be subject to damages of one million five hundred thousand dollars ($1,500,000) if they cancelled the PTW Closing.[147]

336.     Simpson computed the $1,500,000 in damages as

---

[147]   *See* exhibit 1 at page 22, lines 7-8; exhibit 2 and page 42, lines 9-14.

follows: (1) loss of the $75,000 Deposit; (2) $224,000, the balance of the purchase price, in a specific performance action; (3) attorney's fees and costs;[148] and, (4) punitive damages.

337.    The Ahern PTW Contract did not contain a clause providing that the buyers, Plaintiffs, could be forced to specifically perform the Ahern PTW Contract.[149]

338.    However, the Second Addendum, as one of its only three modification provisions to the Ahern PTW Contract, does provide, as is customary in the purchase of real estate, that Plaintiffs, as buyers, could enforce specific performance against the Laughrens, as sellers.[150]

339.    Moreover, the Second Addendum expressly includes in pertinent part, that:

> If Buyer [Plaintiffs] fails to perform this contract within the time specified (including payments of all deposits hereunder), the deposit(s) paid or to be paid hereunder by Buyer shall be retained by the Seller [the Laughrens] as agreed liquidated damages, consideration for the execution of this contract, and _in full settlement of any claim; whereupon Buyer and Seller shall be relieved of all obligations under this contract_.

(emphasis added).[151]

---

[148]    _See_ exhibit 1 at page 22, lines 7-8; exhibit 2 at page 42, lines 9-14.

[149]    _See_ exhibit 26.

[150]    _See_ exhibit 56.

[151]    _See_ exhibit 56.

340.     Therefore, Simpson clearly fell below the accepted standard of care, by advising Plaintiffs that they could be liable for specific performance and/or attorney's fees and costs when the Ahern PTW Contract precluded same on its face by limiting the Laughrens to, at most, the amount of the Deposit.[152]

341.     Moreover, Simpson also clearly fell below the accepted standard of care, by advising Plaintiffs that they could be liable for specific performance and/or attorney's fees and costs where applicable law provides for the remedy of specific performance to buyers, on the basis of the real estate's unique character, and not to sellers (unless expressly provided for, which is not the case here), who are only due money, not of the unique character normally required for specific performance.

342.     In addition to threatening Plaintiffs with the $1,500,000 in damages, Simpson advised Plaintiffs that PTW was a steal at $299,000, and that it would be worth $450,000 in eighteen months time.

343.     On the morning of January 4, 1993, the scheduled PTW Closing, Simpson telephoned Plaintiffs at their rented condominium.

344.     Simpson instructed Plaintiffs to obtain a cashier's check, made payable to Buschman, Ahern & Persons, for one hundred forty-nine thousand, seven hundred ninety-eight dollars and 29/100

---

[152]   Plaintiffs submit that the Deposit was "at most" what the Laughrens could recover, since applicable Florida law also provides that courts can limit the recovery under liquidated damages provisions.

- 53 -

($149,798.29), to complete the purchase price of PTW.

345.      Simpson instructed Plaintiffs to take the cashier's check to his, Simpson's, office at 3:30 p.m. that day.

346.      When Plaintiffs arrived at Simpson's office at 3:30 p.m., they told him they did not want to close on PTW.

347.      Simpson told Plaintiffs this was "a done deal" and that they would incur the $1,500,000 damages if they refused to close.

348.      Simpson then instructed Plaintiffs to sign the following documents in his presence in his office prior to the PTW Closing: (1) a closing statement including an amount of $149,798.29; and, (2) the $75,000 Laughren Purchase Money Mortgage.

349.      Simpson did not explain the closing statement or the Laughren Purchase Money Mortgage to Plaintiffs.

350.      Simpson also told Plaintiffs to give the $149,798.29 cashier's check to him for safe-keeping.

351.      Mr. Stirzaker said he was going to keep the check.

352.      Simpson told Mr. Stirzaker:

> I'm not going to let you walk around with that check.  It's as good as cash.  It's going in my safe now.

353.      Plaintiffs gave Simpson the $149,798.29 cashier's check for safe-keeping.

354.      Simpson told Plaintiffs the PTW Closing would not take place that day, January 4, 1993, because Ahern had forgotten to get a wood destroying organism inspection (hereafter "WDO

- 54 -

Inspection") for PTW.

355.     The Ahern PTW Contract in fact required Simpson, not Ahern, to have a WDO Inspection performed on PTW before closing.[153]

356.     Plaintiffs asked Simpson if they could cancel the Ahern PTW Contract if the WDO Inspection showed damage to PTW.

357.     Simpson told Plaintiffs that WDO damage was not grounds for them to cancel the Ahern PTW Contract.

358.     Simpson then told Plaintiffs he was going to Ahern's office.

359.     Simpson told Plaintiffs the only reason he was going to Ahern's office was:

> to watch Nancy Laughren's face when he waved Plaintiffs' $149,000 check in her face and told her that she could not have the money to close on her new condominium until after the PTW WDO inspection had been performed and reviewed and approved by him [Simpson].

360.     At 4:00 p.m. on January 4, 1993, no WDO Inspection had been performed on PTW.

361.     Simpson and Plaintiffs were to travel to Ahern's office together.

362.     Plaintiffs continued to insist that they wanted to cancel the Ahern PTW Contract.

363.     Simpson again threatened Plaintiffs with the

---

[153]   See exhibit 26.

$1,500,000 damages.[154]

364.     Simpson then told Plaintiffs to drive to Ahern's office by themselves and without him.

365.     Present in Ahern's office were: (1) Ahern; (2) the Laughrens; (3) the Arvida sales agent, E. Joyce Reesh; (4) Augspurger, the Stockton sales agent; (5) Simpson; and, (6) Plaintiffs.

366.     Within a few minutes of entering Ahern's office at 4:00 p.m., Simpson told Plaintiffs that a WDO Inspection of a four thousand one hundred (4,100) square foot wooden house would take in excess of six (6) hours.

367.     Simpson then immediately adjourned the PTW Closing until the WDO Inspection could be performed and the resulting report reviewed and approved by him, Simpson.[155]

368.     Simpson told everyone present that he would contact each of them when a new PTW Closing could be set.

369.     However, in his May 12, letter to the Florida Bar, Simpson stated that a WDO report, both clearance letters, and the related repairs, were completed on January 4, 1993.[156]

370.     Simpson never scheduled a new PTW Closing, because the PTW Closing indeed took place on January 4, 1993.

---

[154]    See exhibit 1 at page 22, lines 7-8; exhibit 2 and page 42, lines 9-14.

[155]    See exhibit 25; exhibit 57.

[156]    See exhibit 3.

371.    On January 4, 1993, PTW was still owned by the Laughrens.[157]

372.    On January 4, 1993, without Plaintiffs' knowledge or permission, Simpson handed over Plaintiffs' $149,798.29 cashier's check to Ahern.

373.    Therefore, on January 4, 1993, Plaintiffs' entire $224,798.29 was in the possession and control of the Laughrens' attorney, Ahern.

374.    Thereafter on January 4, 1993, and despite the fact the PTW Closing had not taken place, Ahern disbursed Plaintiffs' $224,798.29 to the Laughrens; his contemporaneously dated checks confirm same.[158]

375.    The Laughrens knew that the $224,798.29 was Plaintiffs' money, to which they, the Laughrens, were not entitled unless and until the PTW Closing took place.

376.    At 5:00 p.m. on January 4, 1993, the Laughrens used Plaintiffs' money at the previously scheduled Cove Road House closing, towards the purchase of the Cove Road House.[159]

---

[157]  See Ahern's January 14, 1993 letter "to whom it may concern", confirming that the Laughrens were in possession of the deed and title to the Cove Road House on January 4, a copy of which is attached hereto and incorporated herein as exhibit 59.

[158]  See Ahern's contemporaneously dated checks, copies of which are attached hereto and incorporated herein as composite exhibit 60.

[159]  See the Cove Road House closing documents, copies of which are attached hereto and incorporated herein as composite
(continued...)

- 57 -

377.    The balance of the purchase price of the Cove Road House was funded with a mortgage, signed on January 4, 1993, and previously arranged by Ahern.[160]

378.    Moreover, on March 18, 1994, Mr. Laughren filed an affidavit, which confirmed that the PTW Closing was completed on January 4, 1993.[161]

379.    In addition, on January 14, 1993, Ahern wrote a letter "to whom it may concern", confirming that the Laughrens were in possession of the deed and title to the Cove Road House on January 4.[162]

380.    Therefore, at 5:00 p.m. on January 4, 1993, the Laughrens possessed and owned the deeds both to PTW and the Cove Road House.[163]

381.    The Laughrens also obtained homestead protection for the Cove Road House by utilizing Plaintiffs' money to which they had no legal entitlement unless and until the PTW Closing took place.[164]

_____

(...continued)
exhibit 61.

[160]    *See* exhibit 61.

[161]    *See* March 18, 1994 affidavit of Mr. Laughren, a copy of which is attached hereto and incorporated herein as exhibit 62.

[162]    *See* exhibit 59.

[163]    *See* exhibit 59.

[164]    *See* the Laughrens' application for homestead exemption
(continued...)

382.     The effect of the Laughrens utilizing Plaintiffs'
money to purchase the Cove Road House, and to obtain homestead
protection thereby, was to fraudulently place the Cove Road House
beyond the reach of future creditors including Plaintiffs.

383.     Moreover, the Laughrens' fraud and conspiracy to
defraud were confirmed in the St. Johns County Circuit Court's
January 20, 1998 order granting Plaintiffs' motion for default
against the Laughrens.[165]

384.     Thereafter, on April 29, 1998, the St. Johns County
Circuit Court entered a final judgment of $350,090.07 in
Plaintiffs' favor and against the Laughrens.[166]

385.     However, on June 7, 1996, the Laughrens filed a
Chapter 13 bankruptcy.[167]

386.     Following Simpson's adjournment of the PTW Closing,
Ahern arranged for one Richard Taylor to perform the WDO Inspection
of PTW.

---

(...continued)
for the Cove Road House, a copy of which is attached hereto and
incorporated herein as exhibit 63.

[165]    See January 20, 1998 order granting Plaintiffs' motion
for default against the Laughrens, a copy of which is attached
hereto and incorporated herein as exhibit 64.

[166]    See April 29, 1998 final judgment, a copy of which is
attached hereto and incorporated herein as exhibit 65.

[167]    Pursuant to the Laughrens' bankruptcy plan, the Laughrens
are paying Plaintiffs five percent (5%) of the $350,000 claim
Plaintiffs made in the bankruptcy proceeding, in the monthly amount
of approximately four hundred dollars ($400).   Due to the
bankruptcy, the judgment itself is uncollectible.

387.     Taylor's WDO Inspection disclosed WDO damage in PTW.

388.     Taylor furnished his report to Ahern.[168]

389.     On January 5, 1993, following the WDO Inspection, the Laughrens concealed the WDO damage in PTW with masking tape and paint.

390.     Taylor provided Ahern a false WDO clearance letter for PTW.[169]

391.     On January 5, 1993, Simpson arranged for one David Honrath to inspect the WDO "repairs" to PTW.

392.     On January 5, 1993, Honrath provided Simpson a false WDO clearance letter for PTW, saying all damage found had been repaired.[170]

393.     However, Honrath also provided Simpson a rider:

> To treat the Eastern Subterranean termites at the above location, with a repair warranty the cost would be $975.00 with the renewals of $150.00.[171]

394.     Therefore, Honrath both affirmed that there was no current WDO damage to PTW, while at the same time estimating the

---

[168]    *See* Taylor's January 4, 1993 WDO Inspection, a copy of which is attached hereto and incorporated herein as exhibit 66.

[169]    *See* Taylor's January 5, 1993 WDO clearance letter, a copy of which is attached hereto and incorporated herein as exhibit 67.

[170]    *See* Honrath's January 5, 1993 WDO clearance letter, a copy of which is attached hereto and incorporated herein as exhibit 68.

[171]    *See* Honrath's January 5, 1993 rider, a copy of which is attached hereto and incorporated herein as exhibit 69.

cost to repair same.[172]

395.    Most significantly, Honrath's rider was provided to Simpson, Plaintiffs' attorney, prior to Simpson informing Ahern that, based on the second WDO report, certified termite and pest control report, Ahern was authorized to release the [PTW] closing documents for recording and to disperse the closing proceeds from escrow.[173]

396.    On February 18, 1993, some six weeks after the Taylor and Honrath WDO Inspections, a WDO Inspection was performed on PTW by one Peter Powell of Bob Adams & Associates, American Society of Home Inspectors, as part of a detailed home survey/inspection, resulting in a comprehensive thirty-five (35) page colored report (hereafter the "Powell PTW Report").[174]

397.    The Powell PTW Report found serious damage, and stated, in pertinent part:

> You stated a WDO Inspection was done within days before closing and that all defects found were repaired just before closing.  I must then assume that the rot and bug damage list in the previous pages of this report was not discovered by the WDO Inspector, and as such his inspection and report were flawed.  It is my opinion that all of the rot/bug damage found today would have been present during at least the last few months, and that these

---

[172]    *See* exhibit 69 and exhibit 70.

[173]    *See* exhibit 27.

[174]    *See* Powell PTW Report, a copy of which is attached hereto and incorporated herein as exhibit 70.

defects should have been found.[175]

398.     The Powell PTW Report revealed that the cost to repair/replace only those items that the home inspector was qualified to address amounted to forty-thousand dollars ($40,000).

399.     Powell advised Plaintiffs to have a complete structural survey performed on PTW, to determine whether there were defects which he was not professionally qualified to address.

400.     Powell further advised Plaintiffs to contact St. Johns County Building and Codes Department to determine the extent of the building and safety code violations which he had noticed during his inspection.

401.     A WDO Inspection performed on PTW on November 17, 1993 by Florida Pest Control and Chemical Company found visible evidence of "old house borers" (termites) in those same areas that Taylor, Honrath, and Powell had found.[176]

402.     Plaintiffs thus believe that the Taylor and Honrath false WDO clearance letters for PTW were designed to prevent Plaintiffs from canceling the Ahern PTW Contract.

403.     If Plaintiffs had cancelled the Ahern PTW Contract on January 5, 1993, prior to the PTW Closing, Plaintiffs would have learned that, with the assistance of Simpson and Ahern, the

---

[175]   *See* exhibit 70.

[176]   *See* November 17, 1993 WDO Inspection performed on PTW on by Florida Pest Control and Chemical Company, a copy of which is attached hereto and incorporated herein as exhibit 71.

Laughrens had utilized Plaintiffs' money to: (1) pay off the $84,000 Laughren PTW Mortgage; (2) pay $102,000 for the Cove Road House; and, (3) pay a total of $20,600 in real estate commissions to Arvida and Stockton.

404.     After 6:00 p.m. on January 5, 1993, Simpson telephoned Plaintiffs and informed them the PTW Closing had taken place without them, Plaintiffs, being present, and that Plaintiffs now owned PTW.

405.     The closing statement dated January 5, 1993 is not signed by Plaintiffs.[177]

406.     On January 6, 1993, Plaintiffs first inspected PTW.

407.     Plaintiffs were horrified to find dog feces all over the house.

408.     Plaintiffs were also horrified to find the following items to be inoperable and/or defective: (1) domestic electrical appliances; (2) heating, ventilation and air conditioning (HVAC); and, (3) plumbing.

409.     The referenced items are some of the specific items Plaintiffs had demanded Simpson have inspected in their April 10, 1992 and April 14, 1992 letters to Simpson.

410.     Plaintiffs also discovered that the personal property they had purchased from the Laughrens for $18,000 was worth much less.

_____

[177] *See* January 5, 1993 closing statement, a copy of which is attached hereto and incorporated herein as exhibit 72.

411.     In fact, on or about January 1994, Plaintiffs arranged for Murray-Brandenberger, valuers and auctioneers, to appraise the personal property and remove same for auction.[178]

412.     The auction of the personal property recouped a total of only about three thousand dollars of the eighteen thousand Plaintiffs had paid.

413.     Plaintiffs immediately telephoned Simpson about the foregoing.

414.     Simpson told Plaintiffs these systems had been in excellent condition when he had PTW inspected.

415.     Simpson told Plaintiffs to complain to both Arvida and Stockton because it was Arvida's and Stockton's responsibility to ensure the Laughrens handed PTW over to Plaintiffs in the same excellent "As Is" condition which was stipulated to in the Ahern PTW Contract six months earlier.

416.     Plaintiffs complained to Stockton, which passed their complaints on to Arvida, the listing broker.

417.     On January 6, 1993, Plaintiffs showed Reesh, of Arvida, the filthy and defective condition of PTW.

418.     Arvida arranged for Hermon Multiple Services, an industrial cleaning company, to clean PTW.

419.     Arvida told Plaintiffs that the defective condition of PTW was Simpson's responsibility.

---

[178]     *See* Murray-Brandenberger documentation, a copy of which is attached hereto and incorporated herein as composite exhibit 73.

420.     On January 8, 1993, Hermon Multiple Services exposed many other defects in PTW, which had been concealed, including: (1) packing boxes had been placed in front of an interior wall to conceal water damage; (2) holes between the wall(s) and window frame(s) where the window blinds had been affixed to the frames so the damage to the window frames, glass, and seals could not be seen; (3) the jackets round the two water heaters had been spray painted over to conceal the rust underneath; (4) the damaged condition of the furniture and other personal property; (5) dirty diapers between the cushions in the furniture; (6) dirty underwear wrapped around the pipes to absorb the water leaks; (7) the kitchen waste disposal had been painted with numerous coats of red paint to prevent it from falling off and to conceal the rust; (8) the crack in the foundation of the concrete floor of the entire house; (9) sewage water leaking through a downstairs light fitting; (10) duct tape affixed over the rot and bug damage to window frames, base boards, door frames, and exterior wood siding; (11) paint over the duct tape to match the applicable decor so that the duct tape would not be noticeable.[179]

421.     On January 8, 1993, Mr. Stirzaker telephoned Simpson to ask if they had any recourse in law against the Laughrens.[180]

---

[179]   *See* June 1, 1993 affidavit of Hermon Anthony, a copy of which is attached hereto and incorporated herein as exhibit 74.

[180]   *See* Simpson's January 8, 1993 file notes re Plaintiffs' Call, a copy of which is attached hereto and incorporated herein as
(continued...)

422.      Simpson told Mr. Stirzaker:

No.  You will just have to grin and bear it,
Stanley.  Turn the other cheek and accept the
situation.[181]

423.      Beginning on January 8, 1993, Plaintiffs began
arranging for local contractors to estimate the cost to
repair/replace the defects in PTW; specifically: (1) Ocean State
(HVAC); (2) C&M Electrics; (3) Schultz Roofing; (4) Jax Beach glass
(windows).[182]

424.      Plaintiffs learned that some of these contractors
had previously given the Laughrens estimates to repair/replace the
defects in PTW, specifically: (1) Ocean State (HVAC); and, (2)
Schultz Roofing.[183]

425.      Plaintiffs believe that the Laughrens used the
referenced repair/replacement estimates in order to conceal the
defects from prospective buyers, including Plaintiffs.

426.      In January and February of 1993, Plaintiffs kept
Simpson informed, on a daily basis, of the results of the
individual professional contractors' inspections of PTW and the

_____

(...continued)
exhibit 75.

[181]    *See* exhibit 76.

[182]    *See* estimates from Ocean State, C&M, Schultz, and Jax
Beach, copies of which is attached hereto and incorporated herein
as composite exhibit 76.

[183]    *See* file documents from Schultz, a copy of which is
attached hereto and incorporated herein as composite exhibit 77.

concomitant estimates to repair/replace the defects.

427.     Simpson told Plaintiffs:

>     That's it.     They knew.     Rescission of
>     contract.

428.     As a result of the numerous defects and the overall condition of PTW, PTW was uninhabitable.[184]

429.     Plaintiffs lodged with friends until they could obtain, at their cost, a rental condominium.

430.     Initially, Simpson told Plaintiffs:

>     You have been screwed.   You were two patsies
>     out of England.   I would not trust the
>     Laughrens as far as I can throw the building
>     we are sitting on.

431.     However, on February 11, 1993, Simpson wrote to the Laughrens informing them of the concealed defects in PTW.[185]

432.     Simpson advised Plaintiffs that, if they sought to rescind the Ahern PTW Contract, Plaintiffs would have to remove all their personal property and effects from PTW at short notice (their United Kingdom personal property including furniture had been shipped to Florida and was being stored at PTW).

433.     For that alleged reason, Simpson advised Plaintiffs to purchase an alternative property as soon as possible.

---

[184] *See* report of John Adcox, Professor of Structural Engineering at the University of North Florida and president of Adcox Construction Company, Inc., a copy of which is attached hereto and incorporated herein as exhibit 78.

[185] *See* Simpson's February 11, 1993 letter to the Laughrens, a copy of which is attached hereto and incorporated herein as exhibit 79.

434.     Acting on Simpson's advice, and still trusting him, Plaintiffs located what they believed to be a suitable new property at 8997 Lake Kathryn Drive, Sawgrass Country Club (hereafter the "Lake Kathryn House").

435.     Plaintiffs were provided a standard form contract on the Lake Kathryn House (hereafter the "Proposed Lake Kathryn Contract").

436.     Plaintiffs immediately took the Proposed Lake Kathryn Contract to Simpson for him to research the builder, Richard Clayton Rogers, Jr., d/b/a Shelter Contractors (hereafter the "Builder") and the property.

437.     Simpson kept the Proposed Lake Kathryn Contract for several days, ostensibly to research the Builder and the property.

438.     Simpson hand wrote an additional provision to the Proposed Lake Kathryn Contract to the effect that the fifteen thousand dollar ($15,000) deposit demanded by the Builder was to be refunded if the Ahern PTW Contract was not rescinded within ninety (90) days.[186]

439.     Simpson failed to require that Plaintiffs' $15,000 deposit on the Lake Kathryn House be held in escrow.

440.     Simpson failed to research the Builder or the property.

------------------------------------------------------------

[186]   *See* Proposed Lake Kathryn Contract with hand written notations, a copy of which is attached hereto and incorporated herein as exhibit 80.

- 68 -

441.     If Simpson had researched the Builder and the property, he would have discovered that: (1) the Builder was in Chapter 11 bankruptcy; (2) the Lake Kathryn House was encumbered by mechanics liens; and, (3) the mortgage company which held the mortgage on the Lake Kathryn House had commenced foreclosure proceedings against the Builder.

442.     Due to the Builder's financial situation, the Builder's bank would allow the Builder to deposit Plaintiffs' $15,000 check, but would not permit withdrawal thereon.

443.     The Builder then went to Plaintiffs' bank, which exchanged Plaintiffs' $15,000 refundable deposit check for a $15,000 cashier's check, which the Builder then dissipated.

444.     As a direct result of Simpson's foregoing failures, Plaintiffs lost their $15,000 deposit on the Lake Kathryn House.

445.     On March 4, 1993, Plaintiffs wrote to Simpson terminating Simpson's representation of them.

446.     Plaintiffs told Simpson they did not believe he had given them the full support of Florida law either before or since the PTW Closing.

447.     Plaintiffs asked Simpson for the contents of their file.

448.     Despite repeated requests to Simpson, Plaintiffs did not gain access to the contents of their file until three years later, during Simpson's May 15, 1996 deposition.

449.     Moreover, prior to May 15, 1996, Simpson concealed

- 69 -

and/or destroyed portions of Plaintiffs' file.[187]

450.    From March 4, 1993 through March 8, 1993, Plaintiffs tried repeatedly and unsuccessfully to retain another Jacksonville attorney to take their case to sue for rescission of the Ahern PTW Contract and for damages.

451.    Plaintiffs contacted several local attorneys, each of which advised Plaintiffs that Simpson bore the greatest responsibility for their financial losses.

452.    At least six (6) Jacksonville attorneys told Plaintiffs that neither they nor any other Jacksonville attorney would sue Simpson, because Simpson: (1) is a fellow attorney; (2) is the son of Judge Raymond Simpson; and, (3) is a client of Henry Matson Coxe, III, Esq.

453.    On March 8, 1993, desperate to recover the losses they had incurred, and because Simpson had told them he would rescind the Ahern PTW Contract, Plaintiffs rehired Simpson.

454.    Plaintiffs sought to pursue their claims against the Laughrens, Ahern, Arvida, and Stockton.

455.    Simpson refused to sue Ahern and told Plaintiffs they would have to retain someone else to "go after Ahern".

456.    On March 8, 1993, Plaintiffs gave Simpson the original Powell PTW Report and instructed Simpson to rescind the

---

[187]    In exhibits 2, 3, and 4, and Simpson's July 3, 1996 motion for summary judgment, Simpson denied ever receiving certain documents, for example, Plaintiffs' April 14 letter. However, in exhibit 1, Simpson admitted receipt of same.

Ahern PTW Contract.

457.     Simpson approached the various parties responsible for Plaintiffs' damages: (1) the Laughrens; (2) Arvida; and, (3) Stockton, and advised that Plaintiffs would seek legal redress if necessary.

458.     On March 15, 1993, Ahern's partner, Robert B. Persons, Jr. (hereafter "Persons"), sent a letter to Plaintiffs via Simpson threatening to countersue Plaintiffs.[188]

459.     Persons also stated that:

> It is apparent that all of the alleged "defects" decried by your clients are palpably patent, not latent. The subject dwelling house was, of course, over thirteen years old at time of sale, and your clients had overly ample opportunity to observe all of the minute nits at which they now pick.

(emphasis added).[189]

460.     On March 31, 1993, Ahern wrote to Simpson disclaiming any liability for Plaintiffs' losses associated with the PTW transaction.

461.     On or about April 10, 1993, Plaintiffs met with Simpson and his partner, Thomas Copeland, in Simpson's office at Simpson's request.

462.     Simpson and Copeland threatened Plaintiffs with a large retainer and a seven (7) year lawsuit that Plaintiffs had

---

[188]   See March 15, 1993 letter from Persons to Simpson, a copy of which is attached hereto and incorporated herein as exhibit 81.

[189]   See exhibit 82.

little or no chance of winning if they continued to seek rescission of the Ahern PTW Contract and damages.

463.     On April 19, 1993, acting on the advice of a number of real estate lawyers, Plaintiffs filed complaints against Simpson and Ahern with the Florida Bar.

464.     Subsequently, Plaintiffs obtained the numerous (approximately thirty) St. Johns County Building and Codes Department "Rejection for Building Code Violation" notices which had been posted on PTW between 1980 and 1985.[190]

465.     Plaintiffs also learned that St. Johns County had reduced the assessed valuation of PTW by sixty-nine thousand dollars ($69,000) from two hundred seventy-seven thousand one hundred twenty ($277,120) to two hundred eight thousand one hundred twenty $208,720, due to the one thousand two hundred ten (1,210) square foot addition to PTW constructed, contrary to building code standards, by Mr. Laughren in 1985.

466.     In May 1993, Plaintiffs consulted with attorneys David B. Lee, Jr. and Borden Hallowes from Clay County.

467.     Hallowes arranged for John Adcox, Professor of Structural Engineering at the University of North Florida and president of Adcox Construction Company, Inc., to perform a

---

[190]     *See* St. Johns County Building and Codes Department "Rejection for Building Code Violation" notices which had been posted on PTW between 1980 and 1985, copies of which are attached hereto and incorporated herein as composite exhibit 82.

structural survey on PTW.[191]

468.    Professor Adcox hired subcontractors from outside of the Jacksonville area to inspect PTW.

469.    Professor Adcox's structural survey report (hereafter the "Adcox Report") stated that:

> the house has so many problems that we have addressed them in the estimate. I have not listed all of the items in this report. This house appears to have had no maintenance since it was constructed, resulting in a house that is in extremely poor condition and barely usable.[192]

470.    The Adcox Report estimated the total cost to repair PTW at one hundred eleven thousand, six hundred seven dollars ($111,607).[193]

471.    This amount did not include correcting all the building and safety code violations.

472.    Plaintiffs paid $299,000 for PTW, plus $18,000 for the personal property, for which they recovered about $3,000.

473.    On April 16, 1993, PTW was appraised at $240,000.[194]

474.    Therefore, Plaintiffs could not afford to repair PTW, pay the mortgages, and live in PTW.

475.    As a result, Plaintiffs later sold PTW.

---

[191]    *See* exhibit 78.

[192]    *See* exhibit 78.

[193]    *See* exhibit 78.

[194]    *See* April 16, 1993 appraisal of PTW, a copy of which is attached hereto and incorporated herein as exhibit 83.

476.    On June 14, 1993, Hallowes wrote to Simpson, Ahern, the Laughrens, Arvida, and Stockton, giving them ten (10) days to settle without litigation.

477.    Hallowes advised that all Plaintiffs wanted was to be made whole.

478.    As a result of their representation of Plaintiffs, Hallowes and Lee received threatening letters and telephone messages about consequences to them, Hallowes and Lee, if they continued to represent Plaintiffs.[195]

479.    At 5:00 p.m. on June 29, 1993, the Laughrens filed a foreclosure action against Plaintiffs and PTW due to Plaintiffs' payment on the Laughren Purchase Money Mortgage not being received that day.

480.    In fact, the Laughren Purchase Money Mortgage was incorrectly dated January 4, 1993, rather than January 5, 1993, when the PTW deed was delivered.

481.    The Laughren Purchase Money Mortgage should have reflected a January 5, 1993 execution date in accordance with the closing of the PTW transaction, exemplified by delivery of the PTW deed, which took place January 5, 1993.

482.    However, Ahern's office diary entry of June 15, 1993, reflects that the Laughren Purchase Money Mortgage commenced

---

[195]    See, e.g., March 15, 1993 letter from Persons to Simpson and June 16, 1993 letter from Persons to Hallowes, copies of which are attached hereto and incorporated herein as composite exhibit 84.

January 4, 1993.[196]

483.     The Laughrens' foreclosure action, and accompanying *lis pendens*, was thus improper, since Plaintiffs' payment on the Laughren Purchase Money Mortgage was not due until 5:00 p.m. June 30, 1993.

484.     Shortly thereafter, Hallowes filed suit on Plaintiffs' behalf against: (1) Simpson, for legal malpractice; and against: (2) the Laughrens; (3) Arvida; (4) Stockton; and, (5) Ahern, alleging fraud, misrepresentation, conspiracy to defraud.[197]

485.     On January 7, 1994, Simpson served his answer.[198]

486.     On May 17, 1996, Plaintiffs filed their motion for punitive damages, and on May 22, 1996, Plaintiffs filed their amended motion for punitive damages, supported by Mrs. Stirzaker's affidavit, together with twenty-two exhibits documenting Simpson's malpractice.[199]

487.     On July 8, 1996, Simpson served his motion for summary judgment and the supporting affidavits of Ahern and M. Lynn

---

[196]   *See* Ahern's June 15, 1993 office diary entry, a copy of which is attached hereto and incorporated herein as exhibit 85.

[197]   *See* Plaintiffs' second amended complaint, a copy of which is attached hereto and incorporated herein as exhibit 86.

[198]   *See* Simpson's answer, a copy of which is attached hereto and incorporated herein as exhibit 87.

[199]   *See* Plaintiffs' motion and amended motion for punitive damages and supporting affidavit, copies of which are attached hereto and incorporated herein as composite exhibit 88.

- 75 -

Pappas, Esq.[200]

488.     Ahern's affidavit stated, *inter alia*, that:

> on January 5, Simpson informed [Ahern] that,
> based on the second WDO report, certified
> termite and pest control report, that Ahern
> was authorized to release the [PTW] closing
> documents for recording and to disperse the
> closing proceeds from escrow.  [Ahern] did
> same.

489.     However, it is undisputed that the closing proceeds
were never held in escrow, and, more significantly, were dispersed
on January 4.[201]

490.     It is undisputed that the Cove Road House closing
was completed January 4.[202]

491.     It is undisputed that the Laughrens paid for Cove
Road with the proceeds of the PTW Closing.

492.     Moreover, Pappas' affidavit attested to facts as to
which she could not have had first hand knowledge, for example,
that "Plaintiffs never requested Simpson to obtain a home
inspection before or after the date of contract."

493.     On July 12, 1996, Plaintiffs served their memorandum
in opposition to Simpson's motion for summary judgment.[203]

---

[200]     *See* Simpson's July 8, 1996 motion for summary judgment
and supporting affidavits, copies of which are attached hereto and
incorporated herein as composite exhibit 89.

[201]     *See* exhibits 60, 61, 62, 63, and 64.

[202]     *See* exhibits 60, 61, 62, 63, and 64.

[203]     *See* Plaintiffs' July 12, 1996 memorandum in opposition to
(continued...)

494.    The memorandum in opposition specifically referenced Plaintiffs' motion and amended motion for punitive damages and Mrs. Stirzaker's supporting affidavit, which eviscerated Simpson's motion for summary judgment.

495.    On July 30, 1996, the St. Johns County Circuit Court conducted a hearing of less than ten (10) minutes on Simpson's motion for summary judgment; no court reporter was present.

496.    On August 7, 1996, there was before the St. Johns County Circuit Court a plethora of admissible evidence demonstrating a genuine issue of material fact as to Simpson's malpractice.[204]

497.    For example, Simpson claimed that Plaintiffs never requested an Inspection.

498.    This is directly controverted by evidence including: (1) Plaintiffs' April 10, 1992 letter to Simpson; (2) Plaintiffs' April 14, 1992 letter to Simpson; and, (3) Mrs. Stirzaker's affidavit in support of Plaintiffs' amended motion for punitive damages, all of which were properly and timely before the court.

499.    Regardless, on August 7, 1996, the St. Johns County Circuit Court entered its order granting Simpson's summary

_____

(...continued)
Simpson's motion for summary judgment, a copy of which is attached hereto and incorporated herein as exhibit 90.

[204]    *See* exhibit 88.

- 77 -

judgment.[205]

500.    The order granting summary judgment noted it was premised upon:

> the Depositions and the affidavits and pleadings <u>excluding the affidavits which were not timely filed or served</u>.

(emphasis added).

501.    The docket reflects that Plaintiffs' motions concerning punitive damages and Mrs. Stirzaker's supporting affidavit were timely filed.

502.    The order granting summary judgment found:

> That the Plaintiffs were represented by counsel in England.

503.    However, this finding is directly controverted by evidence including: (1) Ahern's May 12, 1993 testimony to the Florida Bar; (2) Porteous' March 23, 1992 letter to Simpson; (3) Porteous' February 22, 1994 to Plaintiffs; and, (4) Mrs. Stirzaker's affidavit in support of Plaintiffs' amended motion for punitive damages, all of which were properly and timely before the court.

504.    The order granting summary judgment also found:

> that the evidence is uncontroverted that the Defendant Simpson referred the Plaintiffs to another attorney who specialized in immigration law to assist them in obtaining visas or resident status.

---

[205] *See* August 7, 1996 order granting Simpson's summary judgment, a copy of which is attached hereto and incorporated herein as exhibit 91.

- 78 -

505.     This finding is directly controverted by evidence including: (1) Simpson's June 7, 1994 testimony to the Florida Bar, which admits that Plaintiffs consulted Simpson on immigration matters in August 1991;[206] (2) Simpson's contemporaneous notes and billing records which confirm that he, Simpson, did not speak to immigration attorney, Vedder, until May 13, 1992; (3) Simpson's May 13, 1992 letter to Vedder; (4) Vedder's May 13, 1992 letter to Plaintiffs; and, (5) Mrs. Stirzaker's affidavit in support of Plaintiffs' amended motion for punitive damages, all of which were properly and timely before the court.

506.     On September 3, 1996, Plaintiffs appealed to the Florida Fifth District of Appeal the order granting summary judgment.

507.     The summary judgment was affirmed without opinion in the late summer of 1998; however, it was not until early in 1999 that Plaintiffs first learned of same.

508.     Thereafter, Plaintiffs prepared and filed a *pro se* Rule 1.540 motion.

509.     On June 25, 1999, Plaintiffs prepared and filed a resubmitted *pro se* 1.540 motion.

510.     On July 1, 1999, the St. Johns County Circuit Court

---

[206]   While Simpson's June 7, 1994 testimony incorrectly stated that Simpson first met Plaintiffs on March 12, 1992, Simpson later retracted that incorrect statement, in his answer brief to the Fifth District Court of Appeal, and admitted that the first meeting was August 1991.

struck and denied Plaintiffs' motion.[207]

511.    However, the St. Johns County Circuit Court did not foreclose Plaintiffs seeking once more to set aside the judgment, provided they were represented by counsel.

512.    On August 10, 1999, Plaintiffs consulted with undersigned counsel and retained her.

513.    In order to bring this action, Plaintiffs have retained the services of undersigned counsel and have promised to pay a reasonable fee for her services.

514.    All conditions precedent to the bringing of this action have been performed, waived, or have occurred.

## COUNT I

### Independent action in equity to set aside a judgment

515.    Plaintiffs hereby adopt and incorporate by reference the allegations set forth in paragraphs 1 through 514 above, as if fully set forth herein.[208]

516.    This is an independent action in equity to set aside a judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure.

517.    The elements of a 60(b) action are: (1) a judgment

---

[207]    *See* July 1, 1999 order on resubmission of Plaintiffs' motion for relief from judgment, a copy of which is attached hereto and incorporated herein as exhibit 92.

[208]    Plaintiff is cognizant of the usual restrictions on the incorporation by reference of so many prior allegations. However, due to the complexity, length, and detail of the common allegations, Plaintiff submits that such is proper here.

- 80 -

which ought not, in equity and good conscience, to be enforced; (2) a good defense to the alleged cause of action on which the judgment is founded;   (3) fraud, accident, or mistake which prevented the defendant in the judgment from obtaining the benefit of his defense;   (4) the absence of fault or negligence on the part of defendant;   and (5) the absence of any remedy at law.

518.   The first element is that the judgment being challenged ought not, in equity and good conscience, to be enforced.

519.   United States courts long ago developed and fashioned an equitable remedy to correct injustices which are found to be sufficiently gross to direct a deviation from the finality ordinarily accorded final judgments, such as where enforcement of the judgment would be manifestly unconscionable.

520.   The summary judgment in this cause was founded not just upon perjured evidence, including affidavits, and Simpson's sworn and perjured Florida Bar and deposition testimony, but on perjured evidence resulting from a conspiracy to present such testimony, a conspiracy involving Simpson, his attorney in the state court malpractice action, and other parties, some of whom are attorneys.[209]

521.   To set aside a judgment, there should be a good

---

[209]   Some of these parties were dismissed from the underlying suit, which Plaintiffs submit was wrongful, but which are not before this Court at this time.

- 81 -

defense to the alleged cause of action on which the judgment is founded.  In this case, the question is whether Plaintiffs can show a genuine issue of material fact which would have precluded Simpson's summary judgment as a matter of law.

522.   The order granting summary judgment in this case found there to be no genuine issue of material fact that Simpson committed legal malpractice in his representation of Plaintiffs.

523.   Plaintiffs contend that the foregoing allegations and supporting evidence thereto demonstrate not just a genuine issue of material fact that Simpson committed legal malpractice, but in fact prove that Simpson did so.

524.   Simpson failed to represent Plaintiffs with the reasonable care, skill, and diligence ordinarily possessed and exercised by other attorneys in the community in similar circumstances in his representation of Plaintiffs on either the real and/estate or immigration matters.

525.   Moreover, Simpson also failed to abide by and/or follow Plaintiffs' instructions.

526.   Therefore, Plaintiffs' opposition to Simpson's motion for summary judgment certainly contained a good defense to said motion on which the order granting summary judgment is founded.

527.   For a 60(b) claim, there should be fraud, accident, or mistake which prevented the party challenging the judgment from obtaining the benefit of his claim.

- 82 -

528.     Courts consistently find fraud sufficient to set aside a judgment where the fraud seeks to defile the forum itself or is a fraud perpetrated by officers of the court, such that the legal system cannot carry out, in the usual manner, its task of impartially adjudicating the cases presented to it.

529.     This type of fraud is the more sufficient to set aside a judgment where there is a deliberate and unconscionable plan or scheme which is designed to present fraudulent evidence.

530.     Here, Simpson conspired with other parties, including his attorney in the state court malpractice action, to perpetrate extrinsic and intrinsic fraud.

531.     Further, this matter does not concern only private parties, but involves issues of great importance to the public at large, the actions and conduct of attorneys.

532.     Tampering with the administration of justice in the manner shown here consists of much more than injury to individual plaintiffs.

533.     Moreover, even if Plaintiffs did not exercise the highest degree of diligence, Simpson's fraud cannot be condoned.

534.     The actions of Simpson therefore rise to the kind of egregious misconduct that entails corruption of the legal process itself.

535.     A 60(b) claim should also include the absence of fault or negligence on the part of the party challenging the judgment.

- 83 -

536.     The verified allegations of this complaint and the supporting documentation thereto demonstrate that Plaintiffs are without fault.

537.     Also, Plaintiffs acted as expeditiously as possible in preparing and filing this complaint, while at the same time taking care both to investigate the facts and to research applicable law.

538.     In particular, and as the Court can plainly see, the factual underpinnings of this action are both voluminous and detailed, and required a protracted period of time to adequately review, draft, and prepare.

539.     In addition, Plaintiffs temporarily live on the west coast of Florida (they do not have, nor have they ever had, permanent immigration status in the United States).  As a result, conferences between Plaintiffs and their undersigned sole practitioner counsel have been scheduled as often as practicable, and recently approximately once or more per week, since Plaintiffs retained undersigned counsel approximately four and one half months ago.

540.     The limited delay in preparing and filing Plaintiff's complaint has caused Simpson no prejudice, since there have been no material or other changes to the *status quo*.

541.     Moreover, equitable relief against fraudulent judgments has always been characterized by the kind of flexibility which permits it to confront new circumstances which require

equitable intervention, and to grant all the relief necessary to correct the particular injustices involved in these situations.

542.    Finally, this cause of action requires that there should be the absence of any adequate remedy at law.

543.    Since the summary judgment has been affirmed by the Florida Fifth District Court of Appeal, Plaintiffs have no remedy at law against Simpson.

544.    Courts have also found it significant that a 60(b) action is supported with affidavits and exhibits.

545.    Plaintiff's claim is supported by the verification of both Plaintiffs, and by the numerous supporting exhibits.

WHEREFORE, the plaintiffs, Stanley Stirzaker and Norma Stirzaker, request that this Court set aside the summary judgment of the St. Johns County Circuit court for the fraud perpetrated thereon as set forth herein, that the Court grant a trial on the merits, that the Court grant recovery of the costs incurred in bringing this action, and for such other and further relief as the Court deems just and proper.

Respectfully submitted this 30th day of December, 1999.

A. MARGARET HESFORD, P.A.
3500 N. State Road 7
Suite 300
Lauderdale Lakes, Florida 33319
Telephone: 954-735-5341
Facsimile: 954-739-2838

By: _____
     A. Margaret Hesford
     Florida Bar no.: 907936

- 85 -

I, Stanley Stirzaker, have read the foregoing complaint and do swear that the allegations contained herein are true and correct to the best of my knowledge and belief.

_____
Stanley Stirzaker

**STATE OF FLORIDA**     )
                          )    **ss.**
**COUNTY OF BROWARD**    )

The foregoing instrument was acknowledged before me this <u>30th</u> day of <u>December</u>, 1999, by Stanley Stirzaker, who is personally known to me.

_____
Notary Public at Large

A. Margaret Hesford
MY COMMISSION # CC850020 EXPIRES
June 27, 2003
BONDED THRU TROY FAIN INSURANCE, INC.

**My commission expires:**

I, Norma Stirzaker, have read the foregoing complaint and do swear that the allegations contained herein are true and correct to the best of my knowledge and belief.

_____
Norma Stirzaker

**STATE OF FLORIDA**     )
                          )    **ss.**
**COUNTY OF BROWARD**    )

The foregoing instrument was acknowledged before me this <u>30th</u> day of <u>December</u>, 1999, by Norma Stirzaker, who is personally known to me.

_____
Notary Public at Large

**My commission expires:**

A. Margaret Hesford
MY COMMISSION # CC850020 EXPIRES
June 27, 2003
BONDED THRU TROY FAIN INSURANCE, INC.

# ADDITIONAL

# ATTACHMENTS

# <u>NOT</u>

# SCANNED

_____ Exceeds scanner's page limit
_____ Physical exhibit prevents scanning
_____ Other:_____

# **REFER TO COURT FILE**

Revised 8/6/99